Dear Mr. Riddle:
Reference is made to your request for an opinion of this office regarding Act No. 1178 of the 2001 Regular Session of the Louisiana Legislature ("Act 1178"), which opinion was requested in your capacity a member of the House of Representatives, before your election to the office of District Attorney. Act 1178 amended, reenacted and enacted various provisions of law relative to the State Employees Group Benefits Program and provided for the reorganization of the state's group life and health insurance program.
In particular, you have requested that we consider LSA-R.S. 42:851A(1)(c)(iii), enacted by Act 1178, which pertains to policies of group health, accident, accidental death and dismemberment, and hospital surgical or medical expense benefits contracted for or funded by the Office of Group Benefits, and which pertinently provides as follows:
 "For those active employees covered by the provisions of Item (i) of this Subparagraph whose state contribution was not less than fifty percent of the total premium paid out of funds of the state on June 30, 2001, the minimum contribution of the state shall be as follows:
 (aa) Beginning July 1, 2001, the minimum contribution by the state shall be fifty-eight percent of the total premium.
 (bb) Beginning July 1, 2002, the minimum contribution by the state shall be sixty-five percent of the total premium.
 (cc) Beginning July 1, 2003, and each year thereafter, the minimum contribution by the state shall be seventy-five percent of the total premium.
 (dd) Nothing herein shall be construed as prohibiting the state from providing contributions at a higher level for participants as provided in this item." (Emphasis added).
According to your correspondence, beginning with 2002-2003 fiscal year, the state has taken the position that although LSA-R.S. 42:851A(1)(c)(iii) requires the state to increase the funding it provides for the premiums attributable to employees to 65%, it is not required to increase the funding it provides for the premiums of dependents. Since July 1, 2002, although the state has paid 65% of the premiums of employees, the state has only paid 50% of the premiums attributable to dependents.
It is your position that the state's posture in this regard is anomalous and incorrect, because in the 2001-2002 fiscal year the state paid 58% of the employee's premium, as well as 58% of the premium for spouses and dependents. The following fiscal year, when the state paid 65% of the employee's premium, but only 50% of the premium for spouse and dependents, the amount payable by employees with families actually went up. It is your opinion that when the Legislature enacted Act 1178, it intended to gradually increase the percentage it paid toward premiums for dependents of employees, as well as the percentage it paid on behalf of the employees themselves.
In light of your position, you seek our opinion as to whether the Legislature intended, at the time Act 1178 was adopted, that the term "total premium" as used in LSA-R.S. 42:851A(1)(c)(iii), was to mean only the employee's premium, or whether the term "total premium" was to include premiums for employees' dependents as well. Ultimately, you seek our opinion as to whether Act 1178 is being properly interpreted, in which case the state would only be responsible for increasing the percentages paid by the state for an employee's own health insurance benefit, and not that of an employee's dependents.
In this regard, you have requested that we review the transcript of the House Committee on Appropriations discussion of House Bill 1492, which became Act 1178, at a meeting held on April 2001, during the 2001 Regular Legislative Session (the "Appropriations Transcript"). You have also submitted for our review the Legislative Fiscal Note prepared in connection with House Bill 1492, and other pertinent documents, all of which are attached hereto for reference.
We have examined Act 1178, as well as the documents which you have submitted for our review. We note that although LSA-R.S. 42:851A(1)(c)(iii), as enacted by Act 1178, refers to "total premiums", that provision of law only refers to "active employees". LSA-R.S. 42:851A(1)(c)(iii) makes no reference to the dependents of "active employees", as do other provisions adopted, enacted or reenacted by Act 1178, including LSA-R.S. 42:821A(i), and most pertinently, LSA-R.S. 42:851A(1)(a)(i). In our opinion, this indicates legislative intent that the increased percentage of premiums to be paid by the state was only intended to be on behalf of "active employees", and not on behalf of their dependents.
Also pertinent to our inquiry is our understanding that the amount appropriated by the Legislature for the state's percentage of premiums for FY 2002-2003 was only of an amount that would allow funding for the increased percentage of premiums of employees only. Based upon our discussions with you and with representatives of the Office of Group Benefits, it is our understanding that the amount appropriated by the Legislature to each employing agency for the payment of premiums on behalf of employees for FY 2002-2003 was far short of the amount that would have been necessary if the Legislature intended for the state to fund an increased percentage of premiums for employee's dependents. The Legislature's intent to increase the state's percentage of premium payments on behalf of employees only is indicated by the fact that the appropriation for premiums for FY 2002-2003, albeit based upon the Office of State Group Benefits' submitted budget, was only of an amount that would allow funding for the increased percentage of premiums on behalf of employees, and not their dependents.
Based upon the foregoing, it is our opinion that a reasonable interpretation of Act 1178 is that the state is only responsible for increasing the percentages the state pays for an employee's own health insurance benefit, as opposed to the percentage the state contributes for the employee's dependents. Although LSA-R.S. 42:851A(1)(c)(iii) requires the state to increase the percentage its pays toward the premiums of "active employees", it does not require the state to increase the percentage it pays toward the premiums of employees' dependents.
In reaching our determination herein, we are guided by the following rules of statutory construction: Words and phrases shall be read with their context and shall be construed according to the common and approved usage of the language. Technical words and phrases, and such others as may have acquired a peculiar and appropriate meaning in the law, shall be construed and understood according to such peculiar and appropriate meaning. LSA-R.S. 1:3. When the language of the law is susceptible of two different meanings, it must be interpreted as having the meaning that best conforms to the purpose of the law. La.C.C. Art. 10. When the words of a law are ambiguous, their meaning must be sought by examining the context in which they occur and the text of the law as a whole.LSA-C.C. Art. 12. Laws on the same subject matter must be interpreted in reference to each other. La.C.C. Art. 13. The fundamental question in all cases of statutory interpretation is legislative intent and the ascertainment of the reason or reasons that prompted the legislature to enact the law. In re Succession of Boyter, 756 So.2d 122 (La. 2001). In interpreting one part or section of an act, the part or section should be interpreted in connection with the rest of the act, and if applicable, in connection with other laws on the same subject matter.Kewaunee Scientific Corp. v. Charles Ragusa Son, Inc. 732 So.2d 470
La. App. 1st Cir. 1998). In construing statutory language, it is the duty of the courts of this state to honor the meaning of a statute as revealed by its language, purpose and history. Zeringue v. State, Dept.of Public Safety, 467 So.2d 1358 (La.App. 5 Cir. 1985). Legislative intent behind statute may be sought by looking to the source of the statute. McGee v. Police Jury of Caddo Parish, 63 So.2d 153 (La. 1953). In construing a statute susceptible of two interpretations, court must study the conditions obtaining at the time of enactment to determine what prompted its enactment. Item Co. v. National Dyers Cleaners,130 So. 879 (La.App., 1930).
Please be advised that our opinion in this regard should not be considered as an indication that we did not consider your position that the Appropriations Transcript indicates legislative intent that the state was to pay 65% of the premium for both employees and their dependents in the 2002-2003 fiscal year. We note, as you no doubt have, that the Appropriations Transcript does not contain any clear and unequivocal assertions by anyone as to what percentages of premiums the state would or should be paying for dependents. Indeed, the only references that we noted with regard to percentages to be paid by the state in FY 2002-2003, albeit with regard to "employees", were references to `sixty-five' percent.
We are compelled to point out however, that although we found no clear reference to the percentage of premiums the state would or should pay for dependents in the Appropriations Transcript, the very first page of discussion contained therein makes it clear that House Bill 1492 was intended to embody the recommendations of the State Employees Health Benefits Study Commission (the "Study Commission"). Pertinently thereto, the Appropriations Transcript states:
 "House Bill 1492 is being brought to you for consideration as a result of the Governor's State Employees Health Benefits Study findings. House Bill 1492 is an omnibus bill that embodies all of the Governor's Study Commission recommendations." (Appropriations Transcript, p. 2. Emphasis added).
With regard to the Study Commission's recommendations, the Office of Group Benefits has provided this office with excerpts of transcripts of the Study Commission's public hearing, held on February 19, 2001 and the Study Commission's meeting of February 20, 2001, copies of which are attached hereto for reference. Although we have not been provided with transcripts of all of the meetings of the Study Commission, a reading of the excerpts we have received, particularly of the meeting of February 20, 2001, clearly indicates that the Study Commission's recommendation was that the state increase only its contribution toward employee's premiums, but not the premiums of the employee's dependents. The Study Commission's discussions at the February 20, 2001 meeting are very clear on the point that the state's contribution toward the premiums of family members of employees would be only 50% of those premiums.
Please note that our research did not reveal, nor are we aware of any law that would prohibit the state from increasing the contribution it pays toward the premiums of employees' dependents. Indeed, the state is constitutionally authorized to contribute public funds for insurance programs for the benefit of public employees [(La. Const. Art. VII, Sec.14(B)(2)], and it clearly availed itself of that authority during FY 2001-2002, when it paid 58% of the premiums of both employees and their dependents.
Respectfully, as we are aware that you do not share our opinion in this regard, we urge you to bring this matter to the attention of the Legislature, should you desire to do so. The Legislature has the unquestionable power and authority to adopt a more generous policy regarding contributions toward employees' dependents premiums, by both clarification of LSA-R.S. 42:851A(1)(c)(iii) and by appropriation of additional sums for dependents' premiums.
We trust the foregoing to be of assistance. Please do not hesitate to contact us if we can be of assistance in other areas of the law.
Yours very truly,
 RICHARD P. IEYOUB Attorney General
 BY: ________________________________ JEANNE-MARIE ZERINGUE BARHAM Assistant Attorney General
RPI/JMZB/dam Attachments
Cc: Mr. A. Kip Wall, Chief Executive Officer, Office of Group Benefits Mr. Tommy D. Benoist, Special Counsel, Office of Group Benefits
 HOUSE COMMITTEE ON APPROPRIATIONS Minutes of Meeting 2001 Regular Session April 9, 2001
I. CALL TO ORDER
Representative Jerry Luke LeBlanc, Chairman of the House Committee on Appropriations, called the meeting to order at 10:14 a.m., in Committee Room 5 of the State Capitol in Baton Rouge, Louisiana.
II. ROLL CALL
Members Present Members Absent
Representative Jerry Luke LeBlanc, Representative Jay McCallum Chairman Representative John Smith Representative Warren Triche, Vice Chairman Representative Donald Cazayoux Representative Hunt Downer Representative Troy Hebert Representative Roy Hopkins Representative Charles Hudson Representative Charles McDonald Representative Ed Murray Representative Renee Pratt Representative Joe Salter Representative Steve Scalise Representative Jack Smith Representative Vic Stelly Representative Francis Thompson Representative Yvonne Welch Representative Diane Winston
III. STAFF MEMBERS PRESENT:
Jay Lueckel, Research Analyst Elise Read, Research Analyst Janis Batchelor, Secretary Margaret Jackson, Sergeant at Arms
IV. DISCUSSION OF LEGISLATION
[The following is a verbatim transcript of the committee's discussionof House Bill No. 1492 by Representative DeWitt, which authorizes theState Employees Group Benefits Program to offer multiple health careplans with different premium rate structures and state contributionrates.]
Rep. LeBlanc: Representative Powell, on behalf of Mr. DeWitt and others.
Rep. Powell: Mr. Chairman, members, as you are aware, we have serious problems with the State Employees Group Benefits Program. House Bill 1492 is being brought to you for consideration as a result of the Governor's State Employees Health Benefits Study findings. House Bill 1492 is an omnibus bill that embodies all of the Governor's Study Commission recommendations. The following areas of concerns have been addressed in this legislation: the new plan governance; create the Board of Group Benefits policy and planning to replace the Board of Trustees. Composition of the board will remain the same; however, the function will change from policy and management to policy review and recommendation. This will ensure that members concerns are addressed by the State Group Benefits Program and will make the commissioner of administration and the governor, with legislative oversight, accountable for the future of the program. The board would no longer be authorized to set rates or benefits, nor approve REPs. This change would allow for more proactive decision-making and increase accountability and efficiency.
 Plan choice — it would keep the current plan choices and allow for separate premiums and consideration of other options. This change would provide more equitable cost sharing between plans. On the plan design, it requires groups that terminate participation assume a pro rata share of the unfunded accrued liability of the health program.
 Increased contributions for active employees — The bill institutes a three-year phase-in of higher state contributions for employee only coverage in an effort to stabilize the plan by retaining current members and increasing enrollment of younger, healthier employees. The phase in would be as follows:
 Year 2001-2002 — we show a 55.6%, but an amendment is going to be offered to change that to 58%. 2002-2003, we would go to 65%; and then the year 2003-2004, the state would pick up 75% of the employee's cost. Retiring/vesting, introduce a participation schedule that would base the state's subsidy of a retiree's premium on the number of years that the individual has participated in the State Group Benefits Program.
 The important part to this is that the current state employees would be grandfathered into the system; however, they would have to join the State Group Benefits Program by January 1, 2002, and be continuously covered until retirement. A disability provision is also included. This change would disallow short-term participation for a long-term benefit, control state costs, and increase early activity enrollment. The vesting schedule is:
 5-9 years in the plan — the state would pay 19% 10-14 years of service — 38% 15-19 years of service — 56% If an employee has 20 years or more years of service — they would pay 75% of the insurance at their retirement
 Life and health insurance participation requires that agencies that elect to participate in one program offered by the State Group Benefits Program participate in all programs offered by the State Group Benefits Program. Allowing agencies with a younger population to opt out of the life insurance program creates an adverse selection for the State Group Benefits Program.
 We are going to change the name of the State Employees Group Benefits Program to the Office of Group Benefits in an effort to provide this program with the opportunity to be a successful, effective program offered to state employees as a true benefit.
 In my opinion, we need to provide our state employees with a steady group benefits program, one that they're not constantly being talked about changing, putting fear into their lives. I think this bill would attain those goals, and Kip Wall [executive director of the State Employees Group Benefits Program] is going to present some of the changes in the program.
Kip Wall: Thank you Representative Powell. As you can see in 1492 before you, there is a reorganization of the Chapter. Like many provisions in the Revised Statutes, it's developed over the years — there's antiquated language in there, it was not logical in the way it was assembled, so we basically reorganized the Chapter so that at the beginning you'll begin with the administration of the program, how it functions, and how it operates. Then you move on into the life portion, the health portion, and then other areas, as well. So there is a reorganization of the provisions. As Representative Powell just mentioned, we are proposing to change the name of the agency from the State Employees Group Benefits Program to the Office of Group Benefits. And that's to better reflect our functions and our responsibilities. We do cover employees besides state employees — the governor's task force that has met and given us many recommendations in this bill did not recommend the name change, per se, but they did look at the participation in Group Benefits. They did not recommend any changes at this time; they felt it was something that was going to require more attention. They have recommended that a subsequent study commission be put together to further look at the operations of the program, so there may at some point in the future be recommendations regarding participation in the program. But at this point in time, there are no recommended changes along that line.
 The bill eliminates duplicate provisions in as far as eligibility and participation of state agencies. Under the old structure of the statutes, you had eligibility for the life insurance program, and then separate and apart from that, you had eligibility for the health insurance program. We've combined that into one set of eligibility criteria that will apply to all individuals, and it will be separate and apart and govern eligibility for the program.
 It clarifies language for the participation of school board employees. Over the years, there had been several provisions put in regarding school boards. Some of them were unclear and appeared to conflict with other language in the statutes, so we clarified — attempted to clarify and consolidate that.
 We have a provision in there which will clarify that no individual may participate in the program unless the agency through which they are employed, or from which they retired, participates in the program. That's been the policy; that's been our interpretation of the law, but again, there's been some conflicting language in the statutes before, and so it did not clearly indicate that you could not participate in this program unless your employing, or the agency from which you retired from, participated in the program.
 We are providing a single, uniform provision for withdrawal from participation in the agency. Currently, there is one provision for state agencies, there is separate language for school boards, and a third set of provisions for the Department of Labor. We are creating one consistent uniform set of provisions for withdrawing from the program.
 There is some outdated language in the bill regarding the State Employees Group Benefits Program certifying premiums for school boards. That's something that was done many years ago, but has not been done since the early 80s; it's not applicable, and we are recommending that be taken out of the statutes.
 We're requiring that agencies participate in both the life and health insurance programs. This year we had one school board that withdrew from the life insurance program but continued participation in the health insurance program. We do not believe that's fair. We believe that if they're going to participate in the health insurance program, they ought to participate in the life insurance program. If not, you are going to see the same situation developing in the life insurance program that we see in the health insurance program now, with younger agencies withdrawing from the life insurance, leaving you with an older population and escalating costs. Now school boards also offer other products to their employees. They do that now; they've done it in the past. This will not interfere with that in the future. They simply will have to offer the state group benefits life insurance program if they participate in the health insurance program, and vice versa. If anyone wanted to participate in the life insurance program, they would also have to offer the health insurance program.
 There's a provision of the statutes that represented the health plan for the city of Bastrop. We know of no reason for it to be in the statutes. I've written a letter to the mayor of the city of Bastrop asking if he has any objection, and I have not heard back. I've copied other elected officials on that, so as far as we know, they have no objection to the elimination of that provision.
 We have a provision in there at this time that sets a specific benefit that at this point only applies to one individual. We are recommending that that language be removed. That individual will still be allowed to participate in the program, but they will receive the same benefits as other participants in the program.
 There is a provision in the program that requires that State Group Benefits reimburse certain elected officials for their out-of-pocket expenses for health care premiums. No one is taking advantage of that at this time that we're aware of. We are recommending that that be removed from the program.
 There's language in the current statutes regarding the investment of funds and the distribution of earnings from those investments. We do not invest funds in our agency. That's handled by the treasurer's office — we believe it's appropriate they handle that — so we're recommending that language be removed.
 Finally, there's some certain special enrollment provisions for retirees that were open for a period of time. The window of opportunity has closed, so we're recommending taking that language out of there. Those retirees and other individuals that would otherwise be impacted by that are protected by a grandfather clause on page 30 of 73, paragraph 7, which provides that any individual or agency that is currently lawfully permitted to participate in State Group Benefits will continue to be permitted to do so in the future.
Thank you.
Rep. Triche: All right — any other information you'd like to present?
Rep. Powell: I think we are ready to receive questions Mr. Vice Chair.
Rep. Triche: First of all, you had technical amendments that were listed? Elise, you want to handle those amendments.
Elise Read: [Ms. Read is a Legislative Analyst for the Appropriations Committee] Members, the technicals are being passed out. It's a two-page set. They go into the bill in places where the name needs to be changed to the new name, and take out some little technical errors — this is a 73-page bill — I'm sure you understand there could have been a few little mistakes. There is a substantive amendment which Mr. Powell referred to earlier. On page 40, line 16, it changes the figure 55 and 60/100 to 58 [refers to percentage of state's contribution to premium cost].
Rep. Triche: All right. First of all we'll handle all technical amendments moved by Mr. Thompson. All in favor. Any objection. So ordered. Next amendment by Mr. — that Elise explained [refers to amendment to change state's contribution to 58%] — any objection to the amendments? So moved. Is that all you have in amendments?
Elise Read: Yes, sir.
Rep. Triche: OK, Mr. Thompson, you're first.
Rep. Thompson: A couple of questions for clarification. I've worked with you all for several months, so I thought maybe just a couple of things — where when this committee may be questioned about what's going on, we would know a few things that might be questioned later on — so that's where my questioning is coming from. What is the — how's the new board to be made up? It's been, in the past, in the Board of Trustees and by the state employees. How's the new board — Kip or Angelle or Tank — any of them can answer.
Rep. Powell: It's going to be the same, Representative Thompson. We're not changing the membership of the board. You know, each department will be represented there — the House of Representatives, the Senate — identical to the makeup of the board now. We're just changing one of their functions.
Kip Wall: With the same selection process — the manner in which they're selected.
Rep. Thompson: Are the retirees being adversely affected in any way whatsoever?
Rep. Powell: No, sir.
Rep. Thompson: Same plan. . . .
Rep. Powell: We'll continue to pay 75% of their premium.
Rep. Thompson: And would the amendment that we just passed — basically what we've done is shored up financially the state employees — or the new plan, the Benefits Program — the Group Benefits Program — just shored it up financially, should this legislation pass.
Rep. Powell: And it should give our active and retirees the peace of mind that we are addressing the problem, and that the problem is going to be resolved. And they won't have to fear that something is going to happen to their health insurance.
Rep. Thompson: And also a question that might be asked — and you can give me the information on this — in the past a person could work most of his adult life in government and not really be a part of the State Group Benefits plan. But he could see that he was going to retire in a month or two, and he's been getting insurance through his wife's teacher retirement or what have you — and he would certainly recognize that the State Group Benefits Program is going to be around a long time, and that it's more sound than any program that I know about that's publicly financed — which it is publicly financed — he could jump into that program and be possibly a burden if he's sick — and most people in that age group close to retirement will need health insurance — he could join that program and get the benefits even though he didn't really participate and pay as we do in our public retirement systems. How do we change this — how do we make that a more just system, one that's fair, one that's on an even playing field?
Rep. Powell: Representative Thompson, what you just described was certainly an adverse selection against the state. That person could pay one or two months of his premiums, and then go into retirement, and the state of Louisiana — the citizens — pick up 75% of his retirement from that point on. And to correct that, we're going to allow those members that are employed today to be grandfathered in, and if they are not participating in the plan, they would have until January 1, 2002 to join, and they would still receive that very lucrative benefit. But for the new employees that are employed after that date, we're going to have a percentage of what the state will pay toward their retirement based upon their participation in the plan.
Rep. Thompson: Similar to our retirement system? And it would be rated? They would know going in so many years, so much credit?
Rep. Powell: That's correct. You're exactly right. Twenty years, you're fully vested — 75% of your health insurance would be paid at retirement.
Rep. Thompson: Last question that I would have — it appears to me that the biggest point of contention, possible opposition in any form, would be by persons — may be not knowledgeable or may have concerns or may be misinformed about — they would have no voice — state employees would no longer have a voice in directing the plan in the future. Is that so, or is that misleading — explain their part and their participation and how we address that in this legislation.
Rep. Powell: Well, they're certainly going to play a valuable part in it, because they're going to be an advisory board, and they're going to make recommendations to the administrator. What they're not going to be able to do, though, is to set the premium rate on a plan that they're going to benefit from, and then also set the benefits from which they're going to receive. We feel like those responsibilities should be transferred to the legislators and to the department of administration. And it really takes some pressure off of them.
Rep. Thompson: In this plan you would see a lot of attention by the Division of Administration, because this will be saddled — helping to saddle him and the governors in the future — that would be a big responsibility to ensure the success of this program, along with the legislature.
Rep. Powell: I think that's going to be a very big plus to the state employees to have more participation by the department of administration and the governor into this plan.
Rep. Thompson: That's all the questions I have, Mr. Vice Chairman.
Rep. Triche: All right. Dr. McDonald.
Rep. McDonald: Kip, tell me who participates now in group benefits — if we adopt the new name — that are not actually state employees. Is that list very exhaustive?
Kip Wall: It depends — and I'm not being facetious — it depends on how you define a state employee. We have all the executive agencies; we have 42 of 66 school boards. But we've got 388 entities that participate in State Group Benefits — from Housing Authorities to Soil and Water Conservation Districts to Levee Districts — they're just all across the board. Basically, working with the staff here — your legislative staff — the best definition we could come up with would be to identify them based on funding — whether or not they are funded through the General Appropriation Bill or some other mechanism.
Rep. McDonald: I was thinking about those agencies that we fund that get a check from the state. Now, are there — are the agencies that are not quote "state agencies" — they pay a premium amount for their employees — whether the employee participates — the agency pays all of it. There's a premium amount paid, and it's the same as a teacher, a highway department employee?
Kip Wall: That's correct.
Rep. McDonald: They all have the same premium and they all enjoy the same benefits?
Kip Wall: At this point in time. There has been discussion, and there is legislative authority, to risk rate the groups — the executive agencies over here, the school boards over here, political subdivisions over here. I expect the next task force to look at that issue a little bit more in depth, so it could occur at some point in the future. But at this point, that is not the case.
Rep. McDonald: Do we have any groups that belong to state group that are not related — any fire districts, school boards, take all those groups out — do we have any groups that belong to state group that really have no connection with state government, in your opinion?
Kip Wall: No, sir. They all have either a civil service system or they have some connection — they are political subdivisions in some form or manner — they are a creation of political activity, by political action.
Rep. McDonald: I had heard in the discussion that one of the goals of the group was to encourage younger employees to become a member. Hopefully, with the increase in the participation by the state of the premium, this will come about. Is there any plan to do any recruiting of groups that will help the pool that we have — this risk pool that we have?
Kip Wall: Well, that's the main driver behind the premium increase — the subsidy increase — to bring it up to 75%, and the vesting provision for retirement. You know, we've got a little carrot and a little stick here. We're going to help them out on their premium rates, but we're also going to require that if they're going to participate in this program as a retiree, they are going to have to contribute before they reach retirement age.
Rep. McDonald: I think you've got some great, great revisions of the program. I think — I know I sat on the board for a while last term, and if we had done this years ago, we wouldn't be here today. It's a change that we were crisis oriented as far as reacting to some of our problems in the state. So I congratulate the commission that worked on this, and there was a lot of work involved in coming to this point. And it's going to help fix things, but I think, in my opinion, what you bring to the table today is not going to be the total fix for this problem. I think it's going to be almost there or a good part of the way, but I think you're going to have to continue to work out some of these things that occurred with piecemeal legislation over the years — we've done some things with the program that would make some people shudder if they really knew. So I congratulate you on that. Could the Appropriations Committee get a list as soon as one's available of — for the standard program or something — with the 75% as we move to 58 this year and 65 — how this is going to affect our new employees in the state and people we are trying to recruit so as we talk with our constituents — and particularly, employees and recruit new employees — that we can show this benefit and about what it's going to cost. One thing I'm interested in is a new employee starting out at the Highway Department or one of our agencies making $1100 or $1200 a month or a thousand a month, is the premium going to be low enough that these people can participate, with the state paying 75%.
Kip Wall: Next year the premiums are going to remain the same. The state is basically assuming the rate increase for next year. It's only going to be in the year after that — the next two years — when it gets up to 65% and 75% — that the employees are going to see a significant benefit.
Rep. McDonald: Once is gets to 75, they'll see enough break — hopefully to recruit — particularly new employees coming on board —
Kip Wall: We hope so.
Rep. Powell: And, Representative McDonald, this certainly will not solve the problem, and we didn't arrive at this problem overnight. But as we bring in these younger employees — average age today is 53 of the covered employee — as we bring in these others, we are going to drive the claims down and the cash flow up. Hopefully, we can improve the plan — as the plan improves — the benefits.
McDonald: On of the complaints I got — and every member on this committee gets — is the slow turnaround time. And I know we had a cash flow problem — when we implement this new program, when will our providers out there see more efficiency in the turnaround on being paid for a claim.
Kip Wall: We're already there. I mean we've got the claims stacked up right now waiting on the money. At this point in time, the division has forwarded UPS payroll to us, so we are almost caught up now. We also have the Supplemental Appropriation Bill that's going through the legislature — it's pending over in the Senate right now — once that makes it through, then we're ready to roll. We can adjudicate the claims.
Rep. McDonald: That's all I have, Mr. Vice Chairman.
Rep. Triche: All right. Mr. Stelly.
Rep. Stelly: Kip, this is a big bill, and you went through a lot of stuff — let me ask you this. What about a school board that is currently opted out — how will they be affected by this bill?
Kip Wall: Basically, they won't. Because under the current provisions, if they came to us today and wanted to come into our program, we're going to risk rate them. We're going to risk rate them into the future until their premium equals our premium.
Rep. Stelly: That's what you'll do now. What will you do under the new bill?
Kip Wall: The same thing. Only we've made it clear it's not just for school boards, it's for everybody that walks through the door. Any agency that joins our program will be risk rated according to their past experience, and they will continue to be risk rated until their experience equals or betters that of State Group Benefits.
Rep. Stelly: So, they're not going to be adversely affected — the ones who presently have opted out?
Kip Wall: Not by this legislation. No, sir.
Rep. Stelly: Well, what are they going to be adversely affected by?
Kip Wall: Well, if they — now, under the current law, they would be adversely affected if they chose to try to come into our program and they had a bad loss experience. You know, if they had been in our program for many years, we'd be sharing their loss experience. But if they have had their loss experience — if they have had bad loss experience over the last two or three years, even right now, if they come to our door —
Rep. Stelly: So, that's no change —
Kip Wall: No, sir, not at all.
Rep. Stelly: Okay. With regard to elected officials, I've got a guy — you mentioned this little deal, and I think it was a couple of years ago we passed it for one individual, which was a sorry way to do business, but we did it — that said that if he chose not to join state group health — a legislator — we had to reimburse him a certain percentage of what he paid personally — and you say nobody has taken advantage of that?
Kip Wall: That is my understanding.
Rep. Stelly: Even this one guy that we passed the bill for him?
Kip Wall: I wasn't there at that time. Operating on hearsay, I, believe that that individual is now a participant in our program.
Rep. Stelly: What about a legislative — no, I'm not calling any names. Supposedly at the time — for your information — supposedly at the time, this particular guy had a beneficiary who was uninsurable. So he said I can't join group health, but ya'll ought to pay me for what I'm paying on my own personally — and it passed. So, we're doing away with that?
Kip Wall: Yes.
Rep. Stelly: There's nothing in there to require a legislator to join group health?
Kip Wall: No, sir.
Rep. Stelly: Okay. Did you say that you have a fiscal note, or you don't yet, as to what this increase from 50 to 75% is going to cost us?
Kip Wall: There is a fiscal note prepared on that.
Rep. Stelly: How much increase is that — that's coming out of the general fund, right?
Kip Wall: For the most part, yes. I'll let Mr. Crow address that.
Brian Crow: Members, Brian Crow, with the Legislative Fiscal Office. Right now in the first year, we are projecting the 55.6% increase to cost the state $21.4 million in general fund out of a total of $55.7 million increase. And that increase is related to funding both the 18% inflation in the program and the shift of the percentage contribution to the state. If they change the percentage to 58%, it would require another $14 million, and about 5.2 or 3 [$5.2 or $5.3 million] of that will be general fund.
Rep. Stelly: $36 million, if we go to 58-something?
Brian Crow: Yes, sir.
Rep. Stelly: By the time we get up to 75, how much extra money is going to have to come out of the general fund for that?
Brian Crow: That will only change the first year. I mean, the percentage increases from — actually, we'll probably decrease the percentage from — well, there will be some — I'll have to do the calculations. There's going to be some percentage switch from 58 to 65, but I'll have to look at that. But the second year the increase is to 65%, the third year's increase is to 75%, and then it flattens out. The last two years show only inflationary increases only.
Rep. Stelly: When we go from paying 58 to 65, there's no increase in how much we come up with?
Brian Crow: Oh, yes sir. It's going to $30 million in the second year, and it'll be $36 million — that number will change to $36 million.
Rep. Stelly: And in the following year?
Brian Crow: It should be probably around 42 or 43 [million] — but again, I would like to recalculate that. But, there will be an increase in both of those two years.
Rep. Stelly: Well, we're going a lot on theory here — that by going from 50 to 75%, we are going to increase the number of young people — and I know that's the whole idea of this. But when we've got a program that's costing us 140 million extra dollars this year, and we're not only paying that, but we're obligating ourselves to another $40 million over the next three years in increased premiums that we'll be paying, I kind of wonder — we've got to sign up a whole lot of young people to cover another $40 million for premiums that we're going to be paying.
Brian Crow: The other thing, Mr. Stelly, is the downsizing that continues in government. You know, there are potentially less employees. The total number that can participate will be affected from that aspect. The other issue here is this increase this year is potentially being absorbed within agency budgets. And to increase this pressure on agency budgets over five years is, I think, a significant consideration that this committee has to look at.
Kip Wall: Representative Stelly, the $140 million will not be paid in its entirety this year.
Rep. Stelly: We just paid 70-something of it.
Kip Wall: That is correct. That will reduce it by half. Then we're coming back to you with a plan to address the remaining part of the deficit. So we do not expect it to be paid all in this year.
Rep. Stelly: Kip, it just worries me that we've got a program here that is not working — hopefully ya'll have come up with something that will make it work — but we're pumping 40 million new dollars in it by putting — and I realize that's good, and I've seen the figures that our state doesn't pay a very high percentage of the employee's premium that some other states do — but it sorts of looks like we're rewarding a program that hasn't been working by paying more of the premium ourselves. And I know the theory, Tank, that ya'll are saying because we're going from 50 to 75%, it'll entice more young people in. I, personally, don't know if it's going to make that much difference. It sounds good.
Rep. Powell: Representative Stelly, the reason we're here this morning is these problems have accumulated over a number of years. Certainly this bill's not going to cure them all, but just by taking the authority of setting the rates and the benefits and allowing the Division of Administration and the governor to do those, I don't think you're going to see a $3.5 million loss every month, and over a period of 10-12 years, accumulate a $140 million deficit. I don't think ya'll are going to allow that to happen.
Rep Stelly: Tank, I'm for all that. My question is simply this, why don't we do all that first and then raise our participation.
Rep. Powell: Well, you know, you're in the insurance business and I am, too. Actuarially, we've got to have more cash flow into the plan, and we should be picking up healthier participants. That premium should help offset — in theory — and our actuaries say it's going to work, but it's not going to work overnight.
Kip Wall: Remember, it's not only the premium increase, it's the vesting requirement —
Rep. Powell: That's going to force them into the plan.
Kip Wall: That's right. Then after that point —
Rep. Stelly: That's if they are thinking about getting it when they retire. How many of these young highway department guys you think are worrying about when they retire — and that's whether they get in or out early. I don't know — and I'm not trying to throw cold water — you've got to do something, Tank, and I appreciate what ya'll are trying to do. My only question was going up on our participation before we see some results. And maybe it's what came first, the chicken or the egg. Maybe it all has to be done at the same time.
Rep. Powell: This is a staring point, and I think a year from now you'll see a difference.
Rep. Stelly: Well, I hope so.
Rep. Powell: We all do.
Rep. Stelly: We can't just keep writing the check.
Rep. Powell: Well, that's what has happened in the past, and that's why we're here today.
Rep. Stelly: Well, and here's the thing — we hear state employees complaining about it's been so many years since they got a raise, I wonder how many of them that are really realizing and appreciate this — saying boy, thank goodness, they're paying more of our health insurance. Because over the years, we've done this on health insurance and retirement, instead of paying — and nobody even considers that a benefit.
Kip Wall: This will be tax free, too.
Rep. Stelly: All right, thanks.
Brain Crow: Mr. Stelly, can I say one other thing? On the assumptions in here, I do assume that the state benefit package modification that group has proposed for this year will be accepted. And that's a $43.7 million hit. If that is rejected, then we will have to increase the estimates in this note by 6-7%.
Rep. Stelly: 6-7?
Brian Crow: An additional 6-7 if that benefit modification package is not accepted.
Rep. Powell: Instead of 18, it would be 25-26%.
Rep. Stelly: So if somewhere along the line we get real generous and cut out that modification of coverage, we Just cost ourselves a few more bucks. So all of this has to fit together, is what you're saying? Take out any one little piece of it —
Kip Wall: There's a ripple effect.
Rep. LeBlanc: I think that's the point, Mr. Stelly.
Rep. Powell: And we're paying an extra $3.5 million every month now. It's not called premiums, it's called claims. But we're paying it every month.
Rep. Stelly: That's right.
Rep. Powell: Or we're letting it accrue.
Rep. Stelly: Thank ya'll.
Rep. LeBlanc: Mr. Thompson, quickly.
Rep. Thompson: It's hard for me to do it very quickly, but —
Rep. LeBlanc: Let's try.
Rep. Thompson: The point that I would like to make, and you've made it, but I want to make it even stronger — that this deficit that we have has been accumulating a very long time. And for Vic's benefit — who has done a tremendous job watching the state's money but also helping to solve the state's retirement problem — this is the same situation that we had there. If we didn't cut the blood flow off now, no telling what it would be. Now, as you so aptly put it, we're not putting up for our state employees to the degree that every other state — I don't know, as I looked at that chart — none of them put in fewer dollars than we have. But we've got to do this to stop the blood flow. So I think this is a good first solution to a problem that's been around for a very long time. It's not a panacea that's going to solve all the problems we have — we're going to have to continue that. That's why you all have recommended that this board continue to spend many, many hours in trying to come up with a better solution. It's got to be fluid for it to work. We're going to have to make decisions like ya'll did, Vic, with the retirement system — the Division of Administration must keep a close eye on this or it could get way out of hand.
Rep. LeBlanc: Mr. Salter.
Rep. Salter: Representative Powell, you mentioned something a minute ago about ya'll — how long have you been here?
Rep. Powell: Six years.
Rep. Salter: That's what I thought. So, it's not ya'll, it's us, right? I'm just kidding you, Tank.
Rep. Powell: I've been on the board about two years — or one year.
Rep. Salter: Do we have people that are going to be adversely affected right now with these changes, or will they have a grace period, did you say, to do whatever they need to do to get in compliance?
Rep. Powell: January 1, 2002.
Rep. Salter: Okay. So we don't have anybody we're going to adversely affect. It's not a prime consideration, but it's a political consideration — have you pretty well — I don't hear much opposition. I would have thought there would be more concern. I don't mean just here — here means nothing. Have you met with other — of course, retirees are not really going to be affected, I guess, except what the board will do from now on.
Rep. Powell: I think the concern out there is that if we don't do anything, this thing's going to blow up. That's the concern. They're ready for some stability in the program, in the plan benefits.
Rep. Salter: Have we ever done this type thing before? Didn't one time before — wasn't this run by the commissioner, and the division, and so forth, years ago?
Kip Wall: Many years ago.
Rep. Salter: Yes. And of course I don't have any problem at all with this commissioner as long as he's here. But of course, whoever is sitting in that chair, that's an important position no matter who the governor is, or who the legislature is. But I was thinking that years ago we had some difficulty and that was, I guess, because of the individual who was there. That's all I have. Thank you.
Rep. LeBlanc: Rep. Downer.
Rep. Downer: My questions are of a general nature to begin with. Because while, to use Representative Thompson's term, cut the blood flow, I don't think we've cut it; I think we've only slowed it. The real problem comes from this — and let me ask these questions; I want to lay the foundation. One, how many individuals are now in the state group program? How many?
Kip Wall: We have 120, 000 employees; 220, 000 lives — that includes spouses and dependents. If you take out the participants in HMOs —
Rep. Downer: Wait, let me go back. I've got to be very elementary. Total number — don't give me the breakout yet — I want the total number who are participating in the program as we speak.
Kip Wall: Approximately 220, 000 individuals in the state of Louisiana.
Rep. Cowner: Now, of that 220, 000, how many are dependents versus the insured?
Kip Wall: Approximately 100, 000.
Rep. Downer: All right. of the 100, 000, how many of those are state employees versus other non-entities.
Kip Wall: There are approximately 54, 000 state — what we would call state — employees. Those are people covered by civil service, and that number would include university personnel but would not include school boards and others.
Rep. Downer: I want to be more specific. The 54, 000 actually draw a check from the state of Louisiana — the treasury of the state.
Kip Wall: Do you include universities in there?
Rep. Downer: Yes.
Kip Wall: 54,000, yes.
Rep. Downer: Of the 54, 000 who are state employees, how many are their dependents. Assuming the same ratio — so we would be talking, roughly, half of the 120, 000 — I guess what I'm trying to say is what is pure state? 54, 000 and we'll double that, so we're probably talking 120, 000 would be considered state insured employees and their dependents. Would that be a fair number — 120 out of the 220?
Kip Wall: I'd say between 100, 000 and 120, 000.
Rep. Downer: Let's say 110 — which is twice — okay, we've got 110. Now — let's now talk about apples to apples. Cause we keep throwing our comparative rates of what we pay and all to other states. How many other states in the union insure all of these other people who do not draw a check directly from the state? Isn't — if my information serves me correct — and it's been a while since I looked at it — Louisiana is one of the only ones, if not the only one, who brings in everybody and their brother under the state umbrella.
Kip Wall: No, there are other states out there that do allow other teachers and other groups to participate. I know that Georgia allows the universities to participate in their program, and I think —
Rep. Downer: University employees are state employees to me, because we are funding them with taxpayer dollars.
Kip Wall: I would have to go back and confirm, but I think that Mississippi allows teachers to participate in their program.
Rep. Downer: Teachers draw a check from the state. We're funding them, and that's where we need to go. How many non-instructional personnel in those school systems are there?
Kip Wall: I don't have that figure.
Rep. Downer: All right. Now, are the only ones who can participate in this program full-time employees, or can part-time employees participate?
Kip Wall: No, the requirement is that individuals be full-time employees. But, in the case of school boards, the school boards determine what constitutes a full-time employee. Many bus drivers who participate in our program may work substantially less than 40 hours a week, as with lunchroom workers and custodial personnel.
Rep. Downer: School board members are in our program?
Kip Wall: Yes, sir, I believe they are.
Rep. Downer: Boards, commissions, levee boards, waterworks districts, and all of that are in our program?
Kip Wall: Now, for non-school board personnel, they have to work 30 hours a week or more.
Rep. Downer: But how about Mr. Snuffy, who is a member of the boon-dock levee board? He's in this program?
Kip Wall: If they certify that he works 30 hours per week —
Rep. Downer: No, no, no. He's a member of the levee board; he's a board member.
Kip Wall: But if he's a very active board member and they certify that he works 30 hours a week or more, he participates in this program.
Rep. Downer: Can you give us a list — between now and when this bill gets to the Floor — of every board, commission, every non-state entity? Cause let me tell you, the reason I say we've only choked the blood, we've only got a tourniquet on it. Until we address the root cause of what's driving our premiums up — you see, we're not the gatekeeper. By the way we've allowed all these people to come in, they determine who enters our program. And they're not worried about the premium cost that our state employees are paying. Our obligation should be for those state employees who are drawing our state check. And I would appreciate it if ya'll would look at it, because until we cut off that, we're not going to address the problem, and all we're going to do is postpone this for another couple of years, and we're going to be right back here. And there will be another group of legislators sitting here addressing another $140 million deficit, and our state employees are going south because we are not going to be able to address their care. I know of instances — I have heard in the past where so and so doesn't have a job, needs health insurance, and he's got a buddy somewhere who's going to get him a part-time job, just enough to be in under the state umbrella. And you know within that 60 or 90 — I don't remember what the transition period is — and before you know it, wham — they're off, they're sick, they're disabled, and we are paying it. It's just a question of priorities. It is a misnomer, and I would hope that whoever is out there in the listening audience or later sees this, realizes we call it state group insurance, but it is not a state group insurance. The history of this is when this state was fat, we went out in a populous society and soaked up everybody we could to become dependent on the state, cause that was political patronage. The time has come that we've got to stop it and reform it.
Kip Wall: Let me say — apparently I didn't make myself — I didn't speak well. We've got another study commission coming. The first study commission did not feel that they had the time to address this particular issue.
Rep. Downer: Well, I'm disappointed. I'm disappointed they didn't. Because to me, when you're sick and you go to the doctor, you do two things. You take medicine to get well, and you try to find out what made you sick so you don't get sick again. All this is is taking the medicine. We haven't addressed the problem. It's going to come back and bite us again. I'm with you; I'm supporting you here. And I'm not — I'm part of the we. I've been here since 1976, and I've watched it grow. We've got to stop it or we're not going to be able to provide benefits to anybody. And then to echo Representative Thompson's concern, there's not one state employee that's going to call us and thank us for this. Just like I've only had one teacher tell me thanks. But I can tell you how many hundreds, if not close to thousands, of letters I got moaning and calling us names and threatening us. And nobody bothered to say thanks. So, what we're doing is a thankless job. It is politically challenging, because we are not going to make friends and influence people like was intended. But we can no longer afford to continue the patronage that this program has built up. And somebody somewhere has got to make the tough decisions. And I'm looking to you all to make the tough decisions and recommendations, and then it's up to the legislature to debate the policy of this state for the future. Should we continue to be everything to everybody, or should we take care of state employees — control the size of government, downsize it, and put it where the taxpayers are demanding. And that's me on Government 101 for today.
Angelle Davis: [Deputy Commissioner of Administration] Thank you, Representative Downer.
Rep. Downer: And I'll move favorable, Mr. Chairman, at the appropriate time, as amended. And, thank you, ma'am. Go ahead; I'm sorry.
Angelle Davis: I just had a quick comment to make. There were two areas where the program was bleeding, and we did look at those and study them carefully, and we addressed those areas. One of the areas was retiree costs — retiree coverage was very, very expensive. And we did analyze retiree participation. We found out that over 1500 retirees had opted into the program in the last three years of active employment with the state. I know that doesn't sound like a whole lot, but when you consider the actuarial costs for the last years of coverage, it is very, very expensive. The other area that we looked at — and there were several school boards that we looked at who are participating in the program — who had very, very active claims. It was very, very expensive, and I think that was the point that you were trying to make — covering everybody. So what we decided to do was to rate risk those school boards or other entities who wanted to join the program. In other words, they will have to pay accordingly.
Rep. Downer: Well, first, I want to compliment you for that, because up to now, that was the problem. They didn't get rate risked, so they didn't care who they went out and tried to enlist — well, first, who they tried to hire so they could give them these benefits. If they are going to start paying it, just maybe. of the 1500 retirees, for example, who joined in the last three years, how many of those were non-state employees? Probably half. Am I correct?
Kip Wall: Very likely.
Rep. Downer: There again is the problem. We could — let me say it another way — in my simple math, we're $140 million short — half of whom are in this program shouldn't be in it and don't belong in it. If they weren't in it, we would only be $70 million short. If we had just had $70 million, we would have been whole. So, we're not whole because of our gatekeeping in the past. And look, I'm not throwing rocks — we're now the gatekeepers. it's up to us.
Angelle Davis: I think with this risk rating we are becoming gatekeepers.
Rep. Downer: Fantastic. Thank you.
Rep. LeBlanc: Mr. Scalise.
Rep. Scalise: Thank you, Mr. Chairman. I've got a lot of good recommendations for motions to make, but I know — and we've looked at this kind of build up, especially over the last few months with the heightened awareness — and I'm glad we're at this point where we're finally starting to stop the bleeding. One of the things I was looking at, and I want to find out if the office, as it will be established, will actually be basing benefits, as well as the premiums, on actuarial soundness. How will that — how closely will they use those principles.
Rep. Powell: In the past, I don't think they've used it very closely. And I passed a resolution urging them to base their premiums and all on the actuaries that they are paying to tell them what to charge. And now they are properly following that.
Rep. Scalise: But I know that we looked — and the staff did a really good job of taking some of the basic benefits and comparing them — and it seemed like in certain areas we were stacking up on benefits as well as premiums, but in other areas we weren't doing well. But where we were doing better than other states — there were some benefits we had that not any other state offers that's costing us maybe between $10-20 million a year. Will — does he intend to set the office up to address some of those things. Because like Mr. Stelly was talking about, on the front end we are ponying up and saying we're going to pay 75% — by the third year, we'll be at 75% — on the benefits, where we are way above every other state — on certain specific benefits — what can we get back in those areas where maybe a handful of people might be benefiting, but at the expense of every other employee in the system?
Kip Wall: According to the rules that are proposed, our $300 annual deductible will increase to $500. That's probably the most common amount out there now. Our co-insurance will move from $500 currently to $1,000 maximum, making your total annual out-of-pocket maximum expense increase from $800 to $1500. That's going to put us very much in the mid-range of what other plans, both private insurance and other states, offer. The primary other change, of course, is the change in the pharmaceutical benefits.
Rep. Scalise: Yes, the 90-day instead of 30-day —
Kip Wall: We're taking that out — that's coming out.
Rep. Scalise: That alone was how much?
Kip Wall: $12 million, I think — 16.5 is what they are telling me. So, we're pulling that out. Moving to the 50/50 co-insurance, which we're proposing to do for next year, that's going to be pretty severe. After we implement these changes, we are by no means going to have an overly rich plan. This is going to bring us closer —
Rep. Scalise: It will be a lot closer to getting us — and I don't know if the fiscal note takes this into account — but does the fiscal note take into account the changes in benefits that would come?
Kip Wall: I think he did include that.
Rep. Scalise: So that's still — even with that, we would be taking a hit, but it doesn't necessarily factor in that we will hopefully be getting a younger, more diverse, healthier pool of people. Right now the way it's set up, if you're an employee that gets sick a lot, this is the plan for you. But if you're an employee that's healthy, you're going to go into the private sector. And then maybe one day you get sick, a month before you retire, boom, you join it, and it's a great deal.
 You had mentioned 1500, Angelle, a number of people in the last three years that had joined prior to retirement. Do you know, on average, how many people joined the system that had never been in — like in their last year they joined right before they retired. Do we know about how many a year are doing that?
Kip Wall: That was a figure she gave you. Right now we have 1500 people participating in the program that had less than three years experience with State Group Benefits before they retired.
Rep. Scalise: That joined this year or in the last three years?
Kip Wall: That would be throughout history — out of the current retiree population — 1500, and that's out of a population of 30, 000 — had participated in group benefits less than three years before retirement.
Rep. Scalise: And with the change they would have until January 1, 2002 to join, and then anyone who joins after that will have to fall under the vesting schedule?
Kip Wall: That is correct.
Rep. Scalise: That's going to be another big savings. I think all the other questions have been asked, but we definitely need to take this first step. It's a big problem, and we've got a big man to take the lead. Thanks for stepping up.
Rep. Powell: Thank you. You can ride on my float again next year at the Strawberry Festival.
Rep. LeBlanc: Mr. Murray.
Rep. Murray: I'm going to be very brief. I've been on the task force since the beginning. Mr. Downer left out when he said he was disappointed that we didn't do everything that we wanted — the meeting is every Tuesday at 8:00 in the morning. A lot of people spent a lot of time to get to this point, and it's a beginning. We all said on the task force that this is a first step. And I'd like to move favorable.
Rep. LeBlanc: There are two additional questions. Mr. Triche.
Rep. Triche: A couple of quick ones. Number one, first of all, if two members of a family, one being a state employee and the other being a school board member, had coverage — say 16 years worth — and a divorce takes place between those two, and the spouse is the school board employee who is not paying into State Group Benefits any longer but staying with the school board insurance — how is that employee looked upon as coming back into your system now as a single, divorced person?
Kip Wall: Let me make sure I understand the hypothetical. You've got a state employee married to a school board employee; the school board employee is not insured through group benefits; their school board has coverage outside. Has the state employee ever participated in group benefits?
Rep. Triche: Yes. 16-year experience, maybe 20 years. Regardless of the time, you said just a few minutes ago that you now have to go 20 years for vestment purposes?
Rep. Powell: After January 1, 2002.
Kip Wall: We have that situation right now. East Baton Rouge Parish is not in our program. So there are state employees who are in the situation you're talking about. State employee has never participated in group benefits; they've been covered through the East Baton Rouge School System. Well, if they come to us on or before December 1, 2001 — this year, 2001 — they get in the program, they're fully vested, they're grandfathered in, they're okay. Now the situation you're talking about where the state employee had participated in group benefits for 16 years, we would give them credit for any time they had participated. If they had participated for 10 years —
Rep. Triche: You would give that credit to the spouse this instance, if it was a family plan?
Kip Wall: For retiree purposes?
Rep. Triche: Yes.
Kip Wall: Yes, they would get whatever credit the retiree has.
Angelle Davis: The spouse has been a member of the program. So as long as the spouse has been a member of the program, they do get credit.
Rep. Triche: Does this count also when that particular school board does not handle any policies with you and they handle their own insurance?
Angelle Davis: If the spouse is a member of the program through the — yes, if the spouse is a member of the program, they're covered by the program, then they are vesting in the program.
Rep. LeBlanc: Mr. Stelly.
Rep. Stelly: A quick question for Brian. I just had a chance to study your fiscal note, and we were talking a few minutes ago about the assumption that more young people would be joining the program and so forth — I noticed your assumptions here — it says you assume the total enrollment and demographics of active employees will remain stable.
Brian Crow: Yes, sir. I think that is a very important consideration in the long-term projections for this plan, because again, the effort to downsize state government and the death spiral that this program is in or was in or could still be in, could possibly create a much smaller base for participation. You hope to get stabilization. If all these things don't happen, then you're going to see flight from the program.
Rep. Stelly: So you're saying that the increase in people joining the plan will offset the decrease due to these other things?
Brian Crow: That is probably the safest assumption to make at this time — at least without knowing what's going to happen in the first two or three years of implementation. if there is an increase in participation shown in the first three years, then I think you could possibly make a small estimate that there could be some estimate in growth in participation. Rep. Stelly:
Rep. Stelly: Do you concur that because of paying increased premiums we are going to get more people in the program?
Brian Crow: I think it will stabilize the program. Can I dance a little bit?
Rep. Stelly: Well, we're dancing on about 57 million bucks here — that's what the fiscal note says for the first year.
Brian Crow: I don't foresee just a rush to the door to participate in the plan even if you do increase premiums in the first year. The only thing it's doing in the first year is eliminating the increase in premiums, so it's a neutral item for employees. Next year you're actually going to see some decrease in the amount of premiums paid; the year after that, you will see a small increase in the amount of premiums paid by the employee. But after that, it flattens out, then they will start to pick up pay increases again.
Rep. Stelly: So we're not going to have thousands of employees who are out there saying "Look, how wonderful; let's go join.
Brian Crow: That's not my opinion. You may want to ask Mr. Wall.
Rep. Stelly: Well, I'm beating a dead horse.
Brian Crow: I understand, but I want to be very careful when I put these estimates out there. It is a big number; it could be bigger. I think if pharmacy inflation gets under control, for instance, two years from now — pharmacy can't keep running the way it is in my opinion, if it does, this could be redone two or three times. If pharmacy goes at 25-30% — which it's running right now on the national average 22% — medical inflation is back up to 11%.
Rep. Stelly: All those things you're saying is why I'm questioning when we do all those good things that Tank and them have in this — and I agree with everything in here — except going from 50 to 75% when I don't think that's going to help us at all, and it's going to cost us more money out of the general fund. But that's just my opinion. But all the rest of the stuff, I think, is a great start.
Brian Crow: My calculations are really based on stabilization. That's what I focused on — that we could stabilize this plan and potentially keep it afloat at this level. But still, building 12.5% increases per year is going to cause some problems in the program if people start having to pay for that themselves in years four and five.
Rep. LeBlanc: All right. Board is clear. Mr. Salter, did you move? Mr. Murray moved — all right, Mr. Murray moves that House Bill — well first of all let me — Clark Cosse, Louisiana Hospital Association, in support; Tom Tate — you want to comment. well, make them very quick.
Tom Tate: My name is Tom Tate; I'm with the Louisiana Association of Educators. I think this bill goes in the right direction. But I think there is an issue out there that is still kind of cloudy, and that's the issue of the school boards' participation. Remember, you have 40-something school boards in, and some outside this program. So how does that affect us. If you're in the state employees group, individual school board budgets pick up that extra six and one-half or eight percent. But how do they pick it up in the school board situation. You also have a problem with funding based upon whether or not some of those school boards are hold-harmless or not. That has to be resolved down the road. The bill's in the right direction, but there's extra money — it's more than as simple as what we're saying in here. I know it's kind of late to get into these kind of discussions, but those are my points I need to bring out.
Rep. LeBlanc: All right, thank you. Okay. Mr. Murray has moved that House Bill 1492 be reported with amendments. Is there any objection? Any objection? Hearing none, so ordered.
[End of discussion of House Bill No. 1492]
Transcribed by Janis Batchelor, Secretary, House Committee on Appropriations August 26, 2002
Opinion Number 03-0149
3 APPROPRIATION 54 — INSURANCE 62-B LEGISLATURE — Acts Bills
La. Const. Art. VII, Sec. 14(B)(2) LSA-R.S. 42:851A (1)(c)(iii)
Pertains to Act 1178 of the 2001 Regular Legislative Session, which amended, reenacted and enacted various provisions of law relative to the State Employees Group Benefits Program, and in particular to LSA-R.S. 42:851A(1)(c)(iii), enacted thereby. Although the state is required to increase the percentage its pays toward the premiums of "active employees", LSA-R.S. 42:851A(1)(c)(iii) does not require the state to increase the percentage it pays toward the premiums of employees' dependents.
Honorable Charles A. Riddle, III District Attorney, District 28 P.O. Box 1200 Marksville, Louisiana 71351
Date Released: April 30, 2003
Jeanne Marie Zeringue Barham Assistant Attorney General
DATE: August 2, 2002
TO: Parish/City School Superintendents Local School Board Presidents Special School Superintendents Colleges of Education, Louisiana State University and Southern University Deans Diocese Superintendents Non-public School Administrators
FROM: Cecil J. Picard State Superintendent of Education
SUBJECT: Circular 1068: 2002-2003 Salary Supplement for Non-Certificated Support Personnel
In the 2002 Regular Session of the Legislature, funds were appropriated for a salary supplement for non-certificated support personnel in House Bill 1. The $20 million appropriation is dedicated to a salary supplement for all non-certificated, unclassified support persons who are not paid exclusively with federal funds. The legislature expressed the intent that this pay increase would be continuing, which will require further action in the next legislative session. Each employer is expected to provide this supplement to all eligible employees. Federal funds should be used for those employees paid exclusively with federal funds. The provision of this supplement will have no impact on the salary schedule.
The allocation of the funds for the salary supplement is based on the October 1, 2001 Profile of Educational Personnel data submitted by each school district and lab school on an FTE basis. Part-time employee should be paid a prorated portion of the salary supplement based on which portion of a full-time employee he/she actually worked: for example, if the employee worked a third of the time of a full-time employee, he/she should receive a third of the salary supplement amount. The personel information for the non-public schools was provided by the labor budgets submitted by the schools. The Fiscal Division of the Department of Corrections provided personnel data for the Office of Youth Development.
Funds are allocated on a per employee basis with an average employer retirement contribution rate of 8% being used to calculate a minimum per eligible employee distribution. The total allocation per entity is based on $514.48 per eligible employee, with a minimum per eligible employee distribution of $476.37. The Department will distribute total funds by the end of August.
For the purposes of the allocation of these funds, non-certificated support personnel are defined as aides (object code 115, function codes 1000-4900); support supervisors (object code 111, function codes 2130, 2300 [except 2311, 2321, 2324, 2831, and 2832] and 2500 through 4900); clerical/secretarial (object code 114, function codes 1000-4900); service workers (object code 116, function codes 1000-4900); skilled craftsmen (object code 117, function codes 1000-4900, except 2134); and other personnel (object codes 100, 110 and 119; function codes 1000-4900).
Each entity receiving funds is to determine which employment date and which timeline to use in the distribution of the pay supplement. For those entities supplying PEP data to the Department, it is suggested that this data be used in making employee eligibility determinations. All entities should maintain sufficient documentation to support this distribution. The deadline for distributing support pay supplements is Friday, October 25, 2002. These funds should be recorded in the FY 02-03 Annual Financial Report in keypunch code 8200 — Revenues From State Sources — Other Restricted Revenues. The salary supplement should be recorded in the Profile of Educational Personnel database as Base Salary.
Additional clarification will be forthcoming as needed. If you have any questions, contact Beth Scioneaux at (225)342-8848 or by e-mail at bscioneaux@doe.state.la.us.
CJP/ML/BS:cs
Attachments
c: Governor Mike Foster SBESE Members Senator Jay Dardenne Senator Gerald Theunissen Representative Jerry Luke LeBlanc Representative Carl Crane Commissioner Mark Drennen Local School System Business Managers/Directors of Finance Carole Wallin, Deputy Superintendent of Education, SDE Marlyn Langley, Deputy Superintendent, Management and Finance, SDE Beth Scioneaux, Director, Education Finance, SDE Kitty Littlejohn, Director, Appropriation control, SDE Tommy Smith, Assistant Director of Budget and Plannning, LSU Dr. Ed Green, Director, LSU Lab School Bob Kuhn, Associate Vice Chancellor, LSU Brenda Sterling, Director, SU Lab School Curtis Lee, Director of Foundations, SU Ron Wascom, LSBA James Cannon, Budget Office, SU George Silbernagel, House Appropriations Paul Fernandez, Office of Planning and Budget David Ray, Senate Finance John Rombach, Legislative Fiscal Office Joey Bielkiewicz, Fiscal Office, Department of Corrections
 2002-2003 Non-certificated, Support Personnel Pay Supplement
Per Eligible Employee Allocation: $514.48
Staff
City/Parish Systems 37,550.9 Special and Lab Schools 237.5 Office of Youth Development 26.0 Non-public Lunch Room Workers 1,060.0
TOTAL Eligible Employees (FTE) 38,874.4
Allocation
City/Parish Systems $19,319,103 Special and Lab Schools $122,172 Office of Youth Development 13,377 Non-public Lunch Room Workers $545,348 TOTAL Eligible Employees (FTE) $20,000,000
Minimum Amount To be Distributed Per $476.37 Eligible Employee:
(reduces allocation by an average retirement contribution of 8%)
Prepared by Education Finance
 $476.37
 Net Retirement
 Eligible Salary Cost Total
LEAs District FTE Allocation Allocation Allocation
001 Acadia Parish 508.2 $242,096 $19,368 $261,464
002 Allen Parish 226.9 $108,088 $8,647 $116,735
003 Ascension Parish 799.8 $380,985 $30,479 $411,465
004 Assumption Parish 312.0 $148,626 $11,890 $160,516
005 Avoyelles Parish 309.0 $147,198 $11,776 $158,974
006 Beauregard Parish 371.2 $176,808 $14,145 $190,953
007 Bienville Parish 173.3 $82,549 $6,604 $89,153
008 Bossier Parish 913.6 $435,211 $34,817 $470,028
009 Caddo Parish 3,006.2 $1,432.050 $114,584 $1,546,614
010 Calcasieu Parish 1,600.2 $762,265 $80,981 $823,246
011 Caldwell Parish 120.5 $57,402 $4,592 $61,994
012 Cameron Parish 122.0 $58,117 $4,649 $62,766
013 Catahoula Parish 142.0 $67,763 $5,421 $73,184
014 Claiborne Parish 163.0 $77,648 $6,212 $83,860
015 Concordia Parish 238.0 $113,395 $9,072 $122,467
016 DeSoto Parish 312.0 $148,626 $11,890 $160,516
017 East Baton Rouge Parish 2,731.0 $1,300,965 $104,077 $1,405,042
018 East Carroll Parish 104.5 $49,779 $3,982 $53,761
019 East Feliciana Parish 157.0 $74,790 $5,983 $80,773
020 Evangeline Parish 333.6 $158,908 $12,713 $171,621
021 Franklin Parish 189.0 $90,021 $7,202 $97,223
022 Grant Parish 211.4 $100,690 $8,055 $108,745
023 Iberia Parish 699.3 $333,147 $26,652 $359,799
024 Iberville Parish 260.9 $124,280 $9,942 $134,222
025 Jackson Parish 147.2 $70,100 $5,608 $75,708
026 Jefferson Parish 2,853.9 $1,359,514 $108,761 $1,468,275
027 Jefferson Davis Parish 310.0 $147,675 $11,814 $159,489
028 Lafayette Parish 1,242.0 $591,637 $47,331 $638,968
029 Lafourche Parish 783.0 $372,998 $29,840 $402,838
030 LaSalle Parish 168.2 $80,109 $6,409 $86,518
031 Lincoln Parish 283.0 $134,812 $10,785 $145,597
032 Livingston Parish 871.2 $415,037 $33,203 $448,240
033 Madison Parish 128.0 $60,971 $4,878 $65,849
034 Morehouse Parish 240.1 $114,388 $9,151 $123,539
035 Natchitoches Parish 326.7 $155,636 $12,451 $168,087
036 Orleans Parish 2,484.6 $1,183,589 $94,602 $1,278.191
037 Ouachita Parish 1,054.9 $502,506 $40,200 $542,706
038 Plaquemines Parish 337.9 $160,963 $12,877 $173,840
039 Pointe Coupee Parish 199.0 $94,782 $7,583 $102,365
040 Rapides Parish 1,249.2 $595,083 $47,607 $642,690
041 Red River Parish 122.6 $58,400 $4,672 $63,072
042 Richland Parish 206.2 $98,234 $7,859 $106,093
043 Sabine Parish 235.6 $112,233 $8,979 $121,212
044 St. Bernard Parish 373.8 $178,076 $14,246 $192,322
045 St. Charles Parish 552.6 $263,230 $21,058 $284,288
046 St. Helena Parish 114.8 $54,693 $4,375 $59,068
047 St. James Parish 249.0 $118,616 $9,489 $128,105
048 St. John Parish 314.0 $149,580 $11,966 $161,546
049 St. Landry Parish 936.6 $446,165 $35,693 $481,858
050 St. Martin Parish 386.2 $183,988 $14,719 $198,707
051 St. Mary Parish 543.5 $258,964 $20,717 $279,681
052 St. Tammany Parish 1,806.0 $860,311 $68,825 $929,136
053 Tangipahoa Parish 817.7 $389,522 $31,162 $420,684
054 Tensas Parish 88.7 $42,263 $3,381 $45,644
055 Terrebonne Parish 1,018.9 $485.397 $38,832 $524,229
056 Union Parish 189.0 $90,033 $7,203 $97,236
057 Vermilion Parish 372.0 $177,209 $14,177 $191,386
058 Vernon Parish 614.3 $292,618 $23,409 $316,027
059 Washington Parish 215.5 $102,656 $8,212 $110,868
060 Webster Parish 361.7 $172,325 $13,786 $186,111
061 West Baton Rouge Parish 214.0 $101,938 $8,155 $110,093
062 West Carroll Parish 114.0 $54,306 $4,344 $58,650
063 West Feliciana Parish 137.0 $65,256 $5,220 $70,476
064 Winn Parish 171.6 $81,742 $6,539 $88,281
065 Monroe City 539.0 $256,763 $20,541 $277,304
066 Bogaiusa City 173.0 $82,412 $6,593 $89,005
 Sub-Total 37,550.9 $17,888,138 $1,430,965 $19,319,103
101 SSD #1 87.0 $41,444 $3,316 $44,760
102 SSD #2 23.0 $10,957 $3,316 $11,834
302 LA School for M.S.A 33.5 $15,937 $1,275 $17,212
304 LA School for Deaf 37.0 $17,625 $1,410 $19,036
305 LA School Vis Impra 15.0 $7,145 $572 $7,717
308 LA Special Ed Center 9.0 $4,287 $343 $4,630
334 NOCCA 15.0 $7,146 $572 $7,718
 Sub-Total 219.5 $104,542 $6,365 $112,907
318 LSU Lab 10.0 $4,764 $381 $5,145
319 Southern Lab 8.0 $3,815 $305 $4,120
 Sub-Total 18.0 $8,579 $686 $9,265
 Office of Youth Dev 26.0 $12,386 $991 $13,377
 Non Public Lunch rm 1,060.0 $504,952 $40,396 $545,348
 Sub-Total 1,086.0 $517,338 $41,387 $558,725
 TOTAL 38,874.4 $18,518,597 $1,481,403 $20,000,000
 8.00% $514,48

2002-03 NONPUBLIC SCHOOL LUNCH SUPPORT PAY RAISE
BASED UPON 01-02 SCHOOL FOOD SERVICE LABOR BUDGETS FOR SUPPORT STAFF
 $476.37
 Retirement
 Part-time Salary Cost Total
Diocese or School Full-time FTE TOTAL Allocation Allocation Allocation
Alexandria Diocese 39 4.0 43.0 $20,484 $1,639 $22,123
Baton Rouge Diocese 162 12.5 174.5 $83,127 $6,650 $89,777
Lafayette Diocese 177 6.0 183.0 $87,174 $6,972 $94,146
Lake Charles Diocese 18 10.0 28.0 $13,338 $1,067 $14,405
Orleans Diocese (Includes
 Houma/Thib) 541 9.0 550.0 $262,004 $20,960 $282,964
Shreveport Diocese 26 2.5 28.5 $13,577 $1,086 $14,663
1st Assembly of God/Assembly
 Christian 4 1.0 5.0 $2,382 $191 $2,573
Boutte Christian Academy 3 1.5 4.5 $2,144 $172 $2,316
Challenge Development
 Center Alt. 3 1.5 4.5 $2,144 $172 $2,316
Charity Christian Academy 6 0.0 6.0 $2,858 $229 $3,087
Chitimacha School 2 0.0 2.0 $953 $76 $1,029
Community Christian 2 0.5 2.5 $1,191 $95 $1,286
Hope Haven/Assoc. Catholic
 Charities 13 1.5 14.5 $6,907 $553 $7,460
Millerville Academy 2 1.0 3.0 $1,429 $114 $1,543
St. James Parish Youth Center 5 0.5 5.5 $2,620 $210 $2,830
Westbank Cathedral Academy 5 0.5 5.5 $2,620 $210 $2,830
 TOTALS 1,008 52.0 1,060.0 $504,952 $40,396 $545,348
 2002 1st Extraordinary Session HB'S AMENDED BY SENATE RETURNED CAL. HB 132 BY LEBLANC REJECT SENATE AMENDMENTS
YEAS
Mr. Speaker Gallot Ordinet Alexander, E Glover Pierre Alexander, R Green Pinac Ansardi Hammett Pitre Baldone Heaton Pratt Baudoin Hebert Quezaire Baylor Hill Richmond Bowler Honey Romero Broome Hopkins Salter Bruce Hudson Scalise Bruneau Hunter Schneider Capella Hutter Schwegmann Carter, K Iles Shaw Cazayoux Jackson, L Smith, G. — 56th Clarkson Jackson, M Smith, J.D. — 50th Crane Johns Smith, J.H. — 8th Crowe Katz Smith, J.R. — 30th Curtis Kennard Sneed Damico Kenney Stelly Daniel Lancaster Swilling Dartez Landrieu Thompson Diez LeBlanc Townsend Doerge Lucas Triche Downer Martiny Tucker Durand McCallum Waddell Farrar McDonald Walsworth Faucheux McVea Welch Flavin Montgomery Winston Frith Morrell Wooton Fruge Morrish Wright Futrell Murray Total — 92
NAYS
Alario LaFleur Riddle Beard Nevers Strain Erdey Perkins Toomy Guillory Powell Total — 11
ABSENT
Carter, R Devillier Total — 2
OFFICE OF GROUP BENEFITSOFFICIAL SCHEDULE OF PROJECTED RATES75% RETIREE PARTICIPATIONJULY 1, 2002
 PPO RATES JULY 1, 2002 STATE EMP SHARE SHARE TOTAL
ACTIVE
 SINGLE 65% 228.64 123.12 351.76 WITH SPOUSE 349.44 243.92 593.36 WITH CHILDREN 331.60 226.08 557.68 FAMILY 417.74 312.22 729.96
RETIRED NO MEDICARE
 SINGLE 601.46 123.12 724.58 WITH SPOUSE 991.62 243.92 1,235.54 WITH CHILDREN 703.54 226.08 929.62 FAMILY 1,196.18 312.22 1,508.40
RETIRED WITH 1 MEDICARE
 SINGLE 154.02 51.34 205.38 WITH SPOUSE 588.76 196.24 785.00 WITH CHILDREN 307.78 102.58 410.36 FAMILY 724.54 247.50 990.04
RETIRED WITH 2 MEDICARE
 WITH SPOUSE 289.24 96.42 385.66 FAMILY 369.42 123.14 492.56
COBRA
 SINGLE 0.00 358.80 358.80 WITH SPOUSE 0.00 605.20 605.20 WITH CHILDREN 0.00 568.84 568.84 FAMILY 0.00 744.56 744.56
PART-TIME COBRA
 SINGLE 228.64 130.16 358.80 WITH SPOUSE 349.44 255.76 605.20 WITH CHILDREN 331.60 237.24 568.84 FAMILY 417.74 326.82 744.56
DISABILITY COBRA
 SINGLE 0.00 527.64 527.64 WITH SPOUSE 0.00 890.02 890.02 WITH CHILDREN 0.00 836.52 836.52 FAMILY 0.00 1,094.94 1,094.94
 LEGISLATIVE FISCAL OFFICE Fiscal Note
Fiscal Note On: HB 1492 HLS 01-1246
Bill Text Version: ENROLLED
Opp Chamb Action:
Sub Bill For:
Proposed Amd:
Date: June 27, 2001 10:30 AM Author: DEWITT
Dept/Agy: State Employees Group Benefits Program (SEGBP)
Subject: Reorganization of SEGBP Analyst: Brian Crow
 +$25,588,861 GF EX See Note
INSURANCE/GROUP — STATE. Provides for the reorganization of SEGBP group life and health group programs.
The proposed legislation provides for the reorganization of SEGBP pursuant to the recommendation of the Governor's State Employee Group Benefits Study Commission. The proposed legislation provides for the following: 1) changes the name of SEGBP to the Office of Group Benefits (OGB); 2) transfers the authority for management of the entire program to OGB and specifies that benefit plans and premium rates are to be developed under the direction of the commissioner of administration; 3) creates the Board of OGB Policy and Planning (16 members with 15 voting) to review life and health benefit programs offered through OGB and provide written recommendations to the appropriate legislative oversight committees; 4) specifies that the commission of administration shall select the CEO (confirmed by Senate) for the program and requires the CEO to appoint the chief operating officer (COO); 5) establishes uniform eligibility criteria for participation in life, health, and other benefit programs sponsored by OGB; 6) establishes uniform criteria for a state agency, school board, or political subdivision to withdraw from programs in OGB; 7) requires that any state agency, school board, or political subdivision that withdraws from OGB shall pay, in advance, a pro-rata portion of any accrued unfunded liability associated with the program; 8) increases the state's contribution of the total health care premium to 58% in FY 02, 65% in FY 03, and 75% in FY 04 and also requires that school boards pay the same proportion of premium increases on behalf of their employees as paid by the state on behalf of state employees; 9) changes the state's contribution for active employees hired after January 1, 2002 for retirement benefits based on years of service to 19% for less than 10 years, 38% for 10 to 15 years, 56% for 15 to 20 years, and 75% more than 20 years of active participation; 9) eliminates payment of health insurance premiums by SEGBP for any elected official whose is subject to term limits; 10) includes a grandfather clause to provide for continued coverage for all existing participants in the program when the bill becomes effective; and 11) requires any rate or benefit changes to be approved by the insurance Rating Commission. The bill becomes effective upon signature of the governor or lapse of time for gubernatorial action.
EXPENDITURES 2001-02 2002-03 2003-04 2004-05 2005-06 5 YEAR TOTAL
State General Fd. $25,588,861 $25,979,324 $37,442,625 $20,382,277 $22,929,802 $132,322,839
Agy. Self-Gen. $11,994,779 $12,177,806 $17,462,897 $9,554,169 $10,748,345 $62,026,331
Stat. Deds./Other $21,923,790 $22,258,327 $32,079,749 $17,462,897 $19,645,586 $113,370,349
Federal Funds $7,130,230 $7,239,030 $10,433,231 $5,679,423 $6,389,294 $6,389,294
Local Funds $0 $0 $0 $0 $0 $0
Annual Total $66,637,660 $67,654,489 $97,506,835 $53,078,716 $59,713,027 $344,590,727
REVENUES 2001-02 2002-03 2003-04 2004-05 2005-06 5 YEAR TOTAL
State General Fd. $0 $0 $0 $0 $0 $0
Agy. Self-Gen. SEE BELOW SEE BELOW SEE BELOW SEE BELOW SEE BELOW
Stat. Deds./Other $0 $0 $0 $0 $0 $0
Federal Funds $0 $0 $0 $0 $0 $0
Local Funds $0 $0 $0 $0 $0 $0
Annual Funds

EXPENDITURE EXPLANATION:
The expenditures shown above represent the increased cost that the statewill incur to provide for the proposed state contribution of health carepremiums paid to SEGBP, excluding $31,500 for travel expenses of the Board and $3,500 for printing costs to publish rules and regulations.
The proposed legislation will increase the state contribution asfollows: FY 02 from 50% to 58%; FY 03 from 58% to 65%; and 04 from 65% to 75%. The increases will enable SEGBP to eliminate cumulative prior year deficits in the program (estimated to be approximately $140 to $145 million by June 30, 2001) and to adequately fund the program for anticipated utilization and inflationary increases. The amounts shown above are based on estimates and assumptions provide by SEGBP as follows:
1) The state contribution for active employees increases from 50% in FY 01 to 75% in FY 04 and continues at that level;
2) The rate increase in FY 02 for PPO is 18.2%; for EPO is 26%; and for HMO is 12%;
3) The proposed benefit modification package will reduce claims payments by $43.7 million;
4) The program will increase premiums 12.5% per year to pay for medical and pharmacy inflation;
5) The state will contribute equally for all employees regardless of the option selected by the employee (PPO, EPO, or HMO); 
6) The total enrollment and demographics of active employees will remain stable.
NOTE: If assumption 3 ($43.7 million — rule changes related to benefit modification in the PPO and EPO) is not implemented, the rate increase for FY 02 will be adjusted upward by 6% to 7%.
In addition, the proposed legislation reduces the state contribution paid for health care premiums of retirees hired on or after January 1, 2001 as follows: 1) from 75% to 19% for less than 10 years of service; 2) from 75% to 38% for 10 to 15 years of service; 3) from 75% to 56% for 15 to 20 years of service; and 4) 75% for more than 20 years of service. The extent of the reduction for state contributions for retiree premiums is unknown, and will depend on the number of employees retiring in each bracket. Obviously, the more employees that meet the qualifications to retire with 20 years or less service and opt to retire, the greater the reduction. In FY 00, the state paid approximately $91.1 million (75% of $121.5 million) for retiree health care premiums.
Also, the proposed legislation establishes uniform criteria for a state agency, school board, or political subdivision to withdraw from programs in OGB. The impact on the expenditures of SEGBP (OGB) as a result of this measure is minimal. The bill does the following: 1) expands termination provisions of existing law to include local school boards, political subdivision, or other entity; 2) requires the head of any agency to provide written notice of intent to withdraw to OGB at least 30 days prior to the anniversary date of the agency joining the program; 3) requires the terminating entity to pay, in advance, an actuarially determined pro rata share of any accrued liabilities of the program; and 4) prohibits said termination until the entire amount of actuarially determined liability is paid in full.
Provisions 1 and 2 above should have very minimal impact on the expenditures of SEGBP (OGB). Provisions 3 and 4 will allow SEGBP to recover expenditures for payment of claims for the terminating entity in excess of paid premiums prior to termination (reimbursement for loss equivalent for that agency).
The bill specifies that the commissioner of administration shall select the CEO (confirmed by Senate) for the program and requires the CEO to appoint the chief operating officer (COO). This will not impact the expenditures of SEGBP (OGB) as these positions are funded in the current budget for the agency.
REVENUE EXPLANATION:
The revenues of SEGBP (or OGB) will increase by amounts similar to those shown above in expenditures.
Senate House
[X] 13.5.1 $500,000 6.8(F) $500,000 Annual Fiscal Cost
 13.5.2 $500,000 6.8(G) $500,000 Tax or Fee Increase or a Net Fee Decrease per year
DUAL REFERRAL RULES
Senate House
 13.5.1 $500,000 Annual 6.8(F) $500,000 Annual Fiscal Fiscal Cost Cost
 13.5.2 Annual Tax or 6.8(G) $500,000 Tax or Fee Fee Change Increase or a Net Fee Decrease per year
____________________ H. Gordon Monk STAFF DIRECTOR
 LEGISLATIVE FISCAL OFFICE Fiscal Note
Fiscal Note On: HB 1492 HLS 01-1246
Bill Text Version ENGROSSED
Opp Chamb Action:
Sub Bill For:
Proposed Amd:
Date: April 11, 2001 8:20 AM Author: DEWITT
Dept/Agy: State Employees Group Benefits Program (SEGBP)
Subject: Reorganization of SEGBP Analyst: Brian Crow
 +$25,588,861 GF EX See Note
INSURANCE/GROUP — STATE: Provides for the reorganization of SEGBP group life and health group programs.
The proposed legislation provides for the reorganization of SEGBP pursuant to the recommendation of the Governor's State Employee Group Benefits Study Commission. The proposed legislation provides for the following: 1) changes the name of SEGBP to the Office of Group Benefits (OGB); 2) transfers the authority for management of the entire program to OGB and specifies that benefit plans and premium rates are to be developed under the direction of the commissioner of administration; 3) creates the Board of OGB Policy and Planning (16 members with 15 voting) to review life and health benefit programs offered through OGB and provide written recommendations to the appropriate legislative oversight committee; 4) specifies that the commissioner of administration shall select the CEO for the program and requires the CEO to appoint the chief operating officer (COO); 5) establishes uniform eligibility criteria for participation in life, health, and other benefit programs sponsored by OGB; 6) establishes uniform criteria for a state agency, school board, or political subdivision to withdraw from programs in OGB; 7) requires that any state agency, school board, or political subdivision that withdraws from OGB shall pay, in advance, a pro-rata portion of any accrued unfunded liability associated with the program; 8) increases the state's contribution of the total health care premium to 58% in FY 02, 65% in FY 03, and 75% in FY 04; 9) changes the state's contribution for active employees hired after January 1, 2002 for retirement benefits based on years of service to 19% for less than 10 years, 38% for 10 to 15 years, 56% for 15 to 20 years, and 75% for more than 20 years of active participation; 9) eliminates payment of health insurance premiums by SEGBP for any elected official whose is subject to term limits; and 10) includes a grandfather clause to provide for continued coverage for all existing participants in the program when the bill becomes effective. The bill becomes effective upon signature of the governor or lapse of time for gubernatorial action.
EXPENDITURES 2001-02 2002-03 2003-04 2004-05 2005-06 5 YEAR TOTAL
State General Fd. $25,588,861 $25,979,324 $37,442,625 $20,382,277 $22,929,802 $132,322,839
Agy. Self-Gen. $11,994,779 $12,177,806 $17,462,897 $9,554,169 $10,748,345 $62,026,331
Stat. Deds./Other $21,923,790 $22,258,327 $32,079,749 $17,462,897 $19,645,586 $113,370,349
Federal Funds $7,130,230 $7,239,030 $10,433,231 $5,679,423 $6,389,294 $6,389,294
Local Funds $0 $0 $0 $0 $0 $0
Annual Total $66,637,660 $67,654,489 $97,506,835 $53,078,716 $59,713,027 $344,590,727
REVENUES 2001-02 2002-03 2003-04 2004-05 2005-06 5 YEAR TOTAL
State General Fd. $0 $0 $0 $0 $0 $0
Agy. Self-Gen. SEE BELOW SEE BELOW SEE BELOW SEE BELOW SEE BELOW
Stat. Deds./Other $0 $0 $0 $0 $0 $0
Federal Funds $0 $0 $0 $0 $0 $0
Local Funds $0 $0 $0 $0 $0 $0
Annual Funds

EXPENDITURE EXPLANATION:
The expenditures shown above represent the increased cost that the statewill incur to provide for the proposed state contribution of health carepremiums paid to SEGBP, excluding $31,500 for travel expenses of the Board and $3,500 for printing costs to publish rules and regulations.
The proposed legislation will increase the state contribution asfollows: FY 02 from 50% to 58%; FY 03 from 58% to 65%; and 04 from 65% to 75%. The increases will enable SEGBP to eliminate cumulative prior year deficits in the program (estimated to be approximately $140 to $145 million by June 30, 2001) and to adequately fund the program for anticipated utilization and inflationary increases. The amounts shown above are based on estimates and assumptions provide by SEGBP as follows:
1) The state contribution for active employees increases from 50% in FY 01 to 75% in FY 04 and continues at that level;
2) The rate increase in FY 02 for PPO is 18.2%; for EPO is 26%; and for HMO is 12%;
3) The proposed benefit modification package will reduce claims payments by $43.7 million;
4) The program will increase premiums 12.5% per year to pay for medical and pharmacy inflation;
5) The state will contribute equally for all employees regardless of the option selected by the employee (PPO, EPO, or HMO); 
6) The total enrollment and demographics of active employees will remain stable.
NOTE: If assumption 3 ($43.7 million — rule changes related to benefit modification in the PPO and EPO) is not implemented, the rate increase for FY 02 will be adjusted upward by 6% to 7%.
In addition, the proposed legislation reduces the state contribution paid for health care premiums of retirees hired on or after January 1, 2001 as follows: 1) from 75% to 19% for less than 10 years of service; 2) from 75% to 38% for 10 to 15 years of service; 3) from 75% to 56% for 15 to 20 years of service; and 4) 75% for more than 20 years of service. The extent of the reduction for state contributions for retiree premiums is unknown, and will depend on the number of employees retiring in each bracket. Obviously, the more employees that meet the qualifications to retire with 20 years or less service and opt to retire, the greater the reduction. In FY 00, the state paid approximately $91.1 million (75% of $121.5 million) for retiree health care premiums.
Also, the proposed legislation establishes uniform criteria for a state agency, school board, or political subdivision to withdraw from programs in OGB. The impact on the expenditures of SEGBP (OGB) as a result of this measure is minimal. The bill does the following: 1) expands termination provisions of existing law to include local school boards, political subdivision, or other entity; 2) requires the head of any agency to provide written notice of intent to withdraw to OGB at least 30 days prior to the anniversary date of the agency joining the program; 3) requires the terminating entity to pay, in advance, an actuarially determined pro rata share of any accrued liabilities of the program; and 4) prohibits said termination until the entire amount of actuarially determined liability is paid in full.
Provisions 1 and 2 above should have very minimal impact on the expenditures of SEGBP (OGB). Provisions 3 and 4 will allow SEGBP to recover expenditures for payment of claims for the terminating entity in excess of paid premiums prior to termination (reimbursement for loss equivalent for that agency).
The bill specifies that the commissioner of administration shall select the CEO (confirmed by Senate) for the program and requires the CEO to appoint the chief operating officer (COO). This will not impact the expenditures of SEGBP (OGB) as these positions are funded in the current budget for the agency.
REVENUE EXPLANATION:
The revenues of SEGBP (or OGB) will increase by amounts similar to those shown above in expenditures.
Senate House
[X] 13.5.1 $500,000 6.8(F) $500,000 Annual Fiscal Cost
 13.5.2 $500,000 6.8(G) $500,000 Tax or Fee Increase or a Net Fee Decrease per year
DUAL REFERRAL RULES
Senate House
 13.5.1 $500,000 Annual 6.8(F) $500,000 Annual Fiscal Fiscal Cost Cost
 13.5.2 Annual Tax or 6.8(G) $500,000 Tax or Fee Fee Change Increase or a Net Fee Decrease per year
____________________ H. Gordon Monk STAFF DIRECTOR
 LEGISLATIVE FISCAL OFFICE Fiscal Note
Fiscal Note On: HB 1492 HLS 01-1246
Bill Text Version REENGROSSED
Opp Chamb Action: w/ SEN FLOOR AMD
Sub Bill For:
Proposed Amd:
Date: May 4, 2001 11:57 AM Author: DEWITT
Dept/Agy: State Employees Group Benefits Program (SEGBP)
Subject: Reorganization of SEGBP Analyst: Brian Crow
 +$25,588,861 GF EX See Note
INSURANCE/GROUP — STATE. Provides for the reorganization of SEGBP group life and health group programs.
The proposed legislation provides for the reorganization of SEGBP pursuant to the recommendation of the Governor's State Employee Group Benefits Study Commission. The proposed legislation provides for the following: 1) changes the name of SEGBP to the Office of Group Benefits (OGB); 2) transfers the authority for management of the entire program to OGB and specifies that benefit plans and premium rates are to be developed under the direction of the commissioner of administration; 3) creates the Board of OGB Policy and Planning (16 members with 15 voting) to review life and health benefit programs offered through OGB and provide written recommendations to the appropriate legislative oversight committees; 4) specifies that the commission of administration shall select the CEO (confirmed by Senate) for the program and requires the CEO to appoint the chief operating officer (COO); 5) establishes uniform eligibility criteria for participation in life, health, and other benefit programs sponsored by OGB; 6) establishes uniform criteria for a state agency, school board, or political subdivision to withdraw from programs in OGB; 7) requires that any state agency, school board, or political subdivision that withdraws from OGB shall pay, in advance, a pro-rata portion of any accrued unfunded liability associated with the program; 8) increases the state's contribution of the total health care premium to 58% in FY 02, 65% in FY 03, and 75% in FY 04 and also requires that school boards pay the same proportion of premium increases on behalf of their employees as paid by the state on behalf of state employees; 9) changes the state's contribution for active employees hired after January 1, 2002 for retirement benefits based on years of service to 19% for less than 10 years, 38% for 10 to 15 years, 56% for 15 to 20 years, and 75% more than 20 years of active participation; 9) eliminates payment of health insurance premiums by SEGBP for any elected official whose is subject to term limits; 10) includes a grandfather clause to provide for continued coverage for all existing participants in the program when the bill becomes effective; and 11) requires any rate or benefit changes to be approved by the insurance Rating Commission. The bill becomes effective upon signature of the governor or lapse of time for gubernatorial action.
EXPENDITURES 2001-02 2002-03 2003-04 2004-05 2005-06 5 YEAR TOTAL
State General Fd. $25,588,861 $25,979,324 $37,442,625 $20,382,277 $22,929,802 $132,322,839
Agy. Self-Gen. $11,994,779 $12,177,806 $17,462,897 $9,554,169 $10,748,345 $62,026,331
Stat. Deds./Other $21,923,790 $22,258,327 $32,079,749 $17,462,897 $19,645,586 $113,370,349
Federal Funds $7,130,230 $7,239,030 $10,433,231 $5,679,423 $6,389,294 $6,389,294
Local Funds $0 $0 $0 $0 $0 $0
Annual Total $66,637,660 $67,654,489 $97,506,835 $53,078,716 $59,713,027 $344,590,727
REVENUES 2001-02 2002-03 2003-04 2004-05 2005-06 5 YEAR TOTAL
State General Fd. $0 $0 $0 $0 $0 $0
Agy. Self-Gen. SEE BELOW SEE BELOW SEE BELOW SEE BELOW SEE BELOW
Stat. Deds./Other $0 $0 $0 $0 $0 $0
Federal Funds $0 $0 $0 $0 $0 $0
Local Funds $0 $0 $0 $0 $0 $0
Annual Funds

EXPENDITURE EXPLANATION:
The expenditures shown above represent the increased cost that the statewill incur to provide for the proposed state contribution of health carepremiums paid to SEGBP, excluding $31,500 for travel expenses of the Board and $3,500 for printing costs to publish rules and regulations.
The proposed legislation will increase the state contribution asfollows: FY 02 from 50% to 58%; FY 03 from 58% to 65%; and 04 from 65% to 75%. The increases will enable SEGBP to eliminate cumulative prior year deficits in the program (estimated to be approximately $140 to $145 million by June 30, 2001) and to adequately fund the program for anticipated utilization and inflationary increases. The amounts shown above are based on estimates and assumptions provide by SEGBP as follows:
1) The state contribution for active employees increases from 50% in FY 01 to 75% in FY 04 and continues at that level;
2) The rate increase in FY 02 for PPO is 18.2%; for EPO is 26%; and for HMO is 12%;
3) The proposed benefit modification package will reduce claims payments by $43.7 million;
4) The program will increase premiums 12.5% per year to pay for medical and pharmacy inflation;
5) The state will contribute equally for all employees regardless of the option selected by the employee (PPO, EPO, or HMO); 
6) The total enrollment and demographics of active employees will remain stable.
NOTE: If assumption 3 ($43.7 million — rule changes related to benefit modification in the PPO and EPO) is not implemented, the rate increase for FY 02 will be adjusted upward by 6% to 7%.
In addition, the proposed legislation reduces the state contribution paid for health care premiums of retirees hired on or after January 1, 2001 as follows: 1) from 75% to 19% for less than 10 years of service; 2) from 75% to 38% for 10 to 15 years of service; 3) from 75% to 56% for 15 to 20 years of service; and 4) 75% for more than 20 years of service. The extent of the reduction for state contributions for retiree premiums is unknown, and will depend on the number of employees retiring in each bracket. Obviously, the more employees that meet the qualifications to retire with 20 years or less service and opt to retire, the greater the reduction. In FY 00, the state paid approximately $91.1 million (75% of $121.5 million) for retiree health care premiums.
Also, the proposed legislation establishes uniform criteria for a state agency, school board, or political subdivision to withdraw from programs in OGB. The impact on the expenditures of SEGBP (OGB) as a result of this measure is minimal. The bill does the following: 1) expands termination provisions of existing law to include local school boards, political subdivision, or other entity; 2) requires the head of any agency to provide written notice of intent to withdraw to OGB at least 30 days prior to the anniversary date of the agency joining the program; 3) requires the terminating entity to pay, in advance, an actuarially determined pro rata share of any accrued liabilities of the program; and 4) prohibits said termination until the entire amount of actuarially determined liability is paid in full.
Provisions 1 and 2 above should have very minimal impact on the expenditures of SEGBP (OGB). Provisions 3 and 4 will allow SEGBP to recover expenditures for payment of claims for the terminating entity in excess of paid premiums prior to termination (reimbursement for loss equivalent for that agency).
The bill specifies that the commissioner of administration shall select the CEO (confirmed by Senate) for the program and requires the CEO to appoint the chief operating officer (COO). This will not impact the expenditures of SEGBP (OGB) as these positions are funded in the current budget for the agency.
REVENUE EXPLANATION:
The revenues of SEGBP (or OGB) will increase by amounts similar to those shown above in expenditures.
Senate House
[X] 13.5.1 $500,000 6.8(F) $500,000 Annual Fiscal Cost
 13.5.2 $500,000 6.8(G) $500,000 Tax or Fee Increase or a Net Fee Decrease per year
DUAL REFERRAL RULES
Senate House
 13.5.1 $500,000 Annual 6.8(F) $500,000 Annual Fiscal Fiscal Cost Cost
 13.5.2 Annual Tax or 6.8(G) $500,000 Tax or Fee Fee Change Increase or a Net Fee Decrease per year
____________________ H. Gordon Monk STAFF DIRECTOR
 LEGISLATIVE FISCAL OFFICE Fiscal Note
Fiscal Note On: HB 1492 HLS 01-1246
Bill Text Version ENGROSSED
Opp Chamb Action:
Sub Bill For:
Proposed Amd:
Date: April 11, 2001 8:20 AM Author: DEWITT
Dept/Agy: State Employees Group Benefits Program (SEGBP)
Subject: Reorganization of SEGBP Analyst: Brian Crow
 +$25,588,861 GF EX See Note
INSURANCE/GROUP — STATE: Provides for the reorganization of SEGBP group life and health group programs.
The proposed legislation provides for the reorganization of SEGBP pursuant to the recommendation of the Governor's State Employee Group Benefits Study Commission. The proposed legislation provides for the following: 1) changes the name of SEGBP to the Office of Group Benefits (OGB); 2) transfers the authority for management of the entire program to OGB and specifies that benefit plans and premium rates are to be developed under the direction of the commissioner of administration; 3) creates the Board of OGB Policy and Planning (16 members with 15 voting) to review life and health benefit programs offered through OGB and provide written recommendations to the appropriate legislative oversight committee; 4) specifies that the commissioner of administration shall select the CEO for the program and requires the CEO to appoint the chief operating officer (COO); 5) establishes uniform eligibility criteria for participation in life, health, and other benefit programs sponsored by OGB; 6) establishes uniform criteria for a state agency, school board, or political subdivision to withdraw from programs in OGB; 7) requires that any state agency, school board, or political subdivision that withdraws from OGB shall pay, in advance, a pro-rata portion of any accrued unfunded liability associated with the program; 8) increases the state's contribution of the total health care premium to 58% in FY 02, 65% in FY 03, and 75% in FY 04; 9) changes the state's contribution for active employees hired after January 1, 2002 for retirement benefits based on years of service to 19% for less than 10 years, 38% for 10 to 15 years, 56% for 15 to 20 years, and 75% for more than 20 years of active participation; 9) eliminates payment of health insurance premiums by SEGBP for any elected official whose is subject to term limits; and 10) includes a grandfather clause to provide for continued coverage for all existing participants in the program when the bill becomes effective. The bill becomes effective upon signature of the governor or lapse of time for gubernatorial action.
EXPENDITURES 2001-02 2002-03 2003-04 2004-05 2005-06 5 YEAR TOTAL
State General Fd. $25,588,861 $25,979,324 $37,442,625 $20,382,277 $22,929,802 $132,322,839
Agy. Self-Gen. $11,994,779 $12,177,806 $17,462,897 $9,554,169 $10,748,345 $62,026,331
Stat. Deds./Other $21,923,790 $22,258,327 $32,079,749 $17,462,897 $19,645,586 $113,370,349
Federal Funds $7,130,230 $7,239,030 $10,433,231 $5,679,423 $6,389,294 $6,389,294
Local Funds $0 $0 $0 $0 $0 $0
Annual Total $66,637,660 $67,654,489 $97,506,835 $53,078,716 $59,713,027 $344,590,727
REVENUES 2001-02 2002-03 2003-04 2004-05 2005-06 5 YEAR TOTAL
State General Fd. $0 $0 $0 $0 $0 $0
Agy. Self-Gen. SEE BELOW SEE BELOW SEE BELOW SEE BELOW SEE BELOW
Stat. Deds./Other $0 $0 $0 $0 $0 $0
Federal Funds $0 $0 $0 $0 $0 $0
Local Funds $0 $0 $0 $0 $0 $0
Annual Funds

EXPENDITURE EXPLANATION:
The expenditures shown above represent the increased cost that the statewill incur to provide for the proposed state contribution of health carepremiums paid to SEGBP, excluding $31,500 for travel expenses of the Board and $3,500 for printing costs to publish rules and regulations.
The proposed legislation will increase the state contribution asfollows: FY 02 from 50% to 58%; FY 03 from 58% to 65%; and 04 from 65% to 75%. The increases will enable SEGBP to eliminate cumulative prior year deficits in the program (estimated to be approximately $140 to $145 million by June 30, 2001) and to adequately fund the program for anticipated utilization and inflationary increases. The amounts shown above are based on estimates and assumptions provide by SEGBP as follows:
1) The state contribution for active employees increases from 50% in FY 01 to 75% in FY 04 and continues at that level;
2) The rate increase in FY 02 for PPO is 18.2%; for EPO is 26%; and for HMO is 12%;
3) The proposed benefit modification package will reduce claims payments by $43.7 million;
4) The program will increase premiums 12.5% per year to pay for medical and pharmacy inflation;
5) The state will contribute equally for all employees regardless of the option selected by the employee (PPO, EPO, or HMO); 
6) The total enrollment and demographics of active employees will remain stable.
NOTE: If assumption 3 ($43.7 million — rule changes related to benefit modification in the PPO and EPO) is not implemented, the rate increase for FY 02 will be adjusted upward by 6% to 7%.
In addition, the proposed legislation reduces the state contribution paid for health care premiums of retirees hired on or after January 1, 2001 as follows: 1) from 75% to 19% for less than 10 years of service; 2) from 75% to 38% for 10 to 15 years of service; 3) from 75% to 56% for 15 to 20 years of service; and 4) 75% for more than 20 years of service. The extent of the reduction for state contributions for retiree premiums is unknown, and will depend on the number of employees retiring in each bracket. Obviously, the more employees that meet the qualifications to retire with 20 years or less service and opt to retire, the greater the reduction. In FY 00, the state paid approximately $91.1 million (75% of $121.5 million) for retiree health care premiums.
Also, the proposed legislation establishes uniform criteria for a state agency, school board, or political subdivision to withdraw from programs in OGB. The impact on the expenditures of SEGBP (OGB) as a result of this measure is minimal. The bill does the following: 1) expands termination provisions of existing law to include local school boards, political subdivision, or other entity; 2) requires the head of any agency to provide written notice of intent to withdraw to OGB at least 30 days prior to the anniversary date of the agency joining the program; 3) requires the terminating entity to pay, in advance, an actuarially determined pro rata share of any accrued liabilities of the program; and 4) prohibits said termination until the entire amount of actuarially determined liability is paid in full.
Provisions 1 and 2 above should have very minimal impact on the expenditures of SEGBP (OGB). Provisions 3 and 4 will allow SEGBP to recover expenditures for payment of claims for the terminating entity in excess of paid premiums prior to termination (reimbursement for loss equivalent for that agency).
The bill specifies that the commissioner of administration shall select the CEO (confirmed by Senate) for the program and requires the CEO to appoint the chief operating officer (COO). This will not impact the expenditures of SEGBP (OGB) as these positions are funded in the current budget for the agency.
REVENUE EXPLANATION:
The revenues of SEGBP (or OGB) will increase by amounts similar to those shown above in expenditures.
Senate House
[X] 13.5.1 $500,000 6.8(F) $500,000 Annual Fiscal Cost
 13.5.2 $500,000 6.8(G) $500,000 Tax or Fee Increase or a Net Fee Decrease per year
DUAL REFERRAL RULES
Senate House
 13.5.1 $500,000 Annual 6.8(F) $500,000 Annual Fiscal Fiscal Cost Cost
 13.5.2 Annual Tax or 6.8(G) $500,000 Tax or Fee Fee Change Increase or a Net Fee Decrease per year
____________________ H. Gordon Monk STAFF DIRECTOR
 LEGISLATIVE FISCAL OFFICE Fiscal Note
Fiscal Note On: HB 1492 HLS 01-1246
Bill Text Version REENGROSSED
Opp Chamb Action:
Sub Bill For:
Proposed Amd:
Date: April 19, 2001 5:06 PM Author: DEWITT
Dept/Agy: State Employees Group Benefits Program (SEGBP)
Subject: Reorganization of SEGBP Analyst: Brian Crow
 +$25,588,861 GF EX See Note
INSURANCE/GROUP — STATE: Provides for the reorganization of SEGBP group life and health group programs.
The proposed legislation provides for the reorganization of SEGBP pursuant to the recommendation of the Governor's State Employee Group Benefits Study Commission. The proposed legislation provides for the following: 1) changes the name of SEGBP to the Office of Group Benefits (OGB); 2) transfers the authority for management of the entire program to OGB and specifies that benefit plans and premium rates are to be developed under the direction of the commissioner of administration; 3) creates the Board of OGB Policy and Planning (16 members with 15 voting) to review life and health benefit programs offered through OGB and provide written recommendations to the appropriate legislative oversight committee; 4) specifies that the commissioner of administration shall select the CEO for the program and requires the CEO to appoint the chief operating officer (COO); 5) establishes uniform eligibility criteria for participation in life, health, and other benefit programs sponsored by OGB; 6) establishes uniform criteria for a state agency, school board, or political subdivision to withdraw from programs in OGB; 7) requires that any state agency, school board, or political subdivision that withdraws from OGB shall pay, in advance, a pro-rata portion of any accrued unfunded liability associated with the program; 8) increases the state's contribution of the total health care premium to 58% in FY 02, 65% in FY 03, and 75% in FY 04; 9) changes the state's contribution for active employees hired after January 1, 2002 for retirement benefits based on years of service to 19% for less than 10 years, 38% for 10 to 15 years, 56% for 15 to 20 years, and 75% for more than 20 years of active participation; 9) eliminates payment of health insurance premiums by SEGBP for any elected official whose is subject to term limits; and 10) includes a grandfather clause to provide for continued coverage for all existing participants in the program when the bill becomes effective. The bill becomes effective upon signature of the governor or lapse of time for gubernatorial action.
EXPENDITURES 2001-02 2002-03 2003-04 2004-05 2005-06 5 YEAR TOTAL
State General Fd. $25,588,861 $25,979,324 $37,442,625 $20,382,277 $22,929,802 $132,322,839
Agy. Self-Gen. $11,994,779 $12,177,806 $17,462,897 $9,554,169 $10,748,345 $62,026,331
Stat. Deds./Other $21,923,790 $22,258,327 $32,079,749 $17,462,897 $19,645,586 $113,370,349
Federal Funds $7,130,230 $7,239,030 $10,433,231 $5,679,423 $6,389,294 $6,389,294
Local Funds $0 $0 $0 $0 $0 $0
Annual Total $66,637,660 $67,654,489 $97,506,835 $53,078,716 $59,713,027 $344,590,727
REVENUES 2001-02 2002-03 2003-04 2004-05 2005-06 5 YEAR TOTAL
State General Fd. $0 $0 $0 $0 $0 $0
Agy. Self-Gen. SEE BELOW SEE BELOW SEE BELOW SEE BELOW SEE BELOW
Stat. Deds./Other $0 $0 $0 $0 $0 $0
Federal Funds $0 $0 $0 $0 $0 $0
Local Funds $0 $0 $0 $0 $0 $0
Annual Funds

EXPENDITURE EXPLANATION:
The expenditures shown above represent the increased cost that the statewill incur to provide for the proposed state contribution of health carepremiums paid to SEGBP, excluding $31,500 for travel expenses of the Board and $3,500 for printing costs to publish rules and regulations.
The proposed legislation will increase the state contribution asfollows: FY 02 from 50% to 58%; FY 03 from 58% to 65%; and 04 from 65% to 75%. The increases will enable SEGBP to eliminate cumulative prior year deficits in the program (estimated to be approximately $140 to $145 million by June 30, 2001) and to adequately fund the program for anticipated utilization and inflationary increases. The amounts shown above are based on estimates and assumptions provide by SEGBP as follows:
1) The state contribution for active employees increases from 50% in FY 01 to 75% in FY 04 and continues at that level;
2) The rate increase in FY 02 for PPO is 18.2%; for EPO is 26%; and for HMO is 12%;
3) The proposed benefit modification package will reduce claims payments by $43.7 million;
4) The program will increase premiums 12.5% per year to pay for medical and pharmacy inflation;
5) The state will contribute equally for all employees regardless of the option selected by the employee (PPO, EPO, or HMO); 
6) The total enrollment and demographics of active employees will remain stable.
NOTE: If assumption 3 ($43.7 million — rule changes related to benefit modification in the PPO and EPO) is not implemented, the rate increase for FY 02 will be adjusted upward by 6% to 7%.
In addition, the proposed legislation reduces the state contribution paid for health care premiums of retirees hired on or after January 1, 2001 as follows: 1) from 75% to 19% for less than 10 years of service; 2) from 75% to 38% for 10 to 15 years of service; 3) from 75% to 56% for 15 to 20 years of service; and 4) 75% for more than 20 years of service. The extent of the reduction for state contributions for retiree premiums is unknown, and will depend on the number of employees retiring in each bracket. Obviously, the more employees that meet the qualifications to retire with 20 years or less service and opt to retire, the greater the reduction. In FY 00, the state paid approximately $91.1 million (75% of $121.5 million) for retiree health care premiums.
Also, the proposed legislation establishes uniform criteria for a state agency, school board, or political subdivision to withdraw from programs in OGB. The impact on the expenditures of SEGBP (OGB) as a result of this measure is minimal. The bill does the following: 1) expands termination provisions of existing law to include local school boards, political subdivision, or other entity; 2) requires the head of any agency to provide written notice of intent to withdraw to OGB at least 30 days prior to the anniversary date of the agency joining the program; 3) requires the terminating entity to pay, in advance, an actuarially determined pro rata share of any accrued liabilities of the program; and 4) prohibits said termination until the entire amount of actuarially determined liability is paid in full.
Provisions 1 and 2 above should have very minimal impact on the expenditures of SEGBP (OGB). Provisions 3 and 4 will allow SEGBP to recover expenditures for payment of claims for the terminating entity in excess of paid premiums prior to termination (reimbursement for loss equivalent for that agency).
The bill specifies that the commissioner of administration shall select the CEO (confirmed by Senate) for the program and requires the CEO to appoint the chief operating officer (COO). This will not impact the expenditures of SEGBP (OGB) as these positions are funded in the current budget for the agency.
REVENUE EXPLANATION:
The revenues of SEGBP (or OGB) will increase by amounts similar to those shown above in expenditures.
Senate House
[X] 13.5.1 $500,000 6.8(F) $500,000 Annual Fiscal Cost
 13.5.2 $500,000 6.8(G) $500,000 Tax or Fee Increase or a Net Fee Decrease per year
DUAL REFERRAL RULES
Senate House
 13.5.1 $500,000 Annual 6.8(F) $500,000 Annual Fiscal Fiscal Cost Cost
 13.5.2 Annual Tax or 6.8(G) $500,000 Tax or Fee Fee Change Increase or a Net Fee Decrease per year
____________________ H. Gordon Monk STAFF DIRECTOR
 LEGISLATIVE FISCAL OFFICE Fiscal Note
Fiscal Note On: HB 1492 HLS 01-1246
Bill Text Version REENGROSSED
Opp Chamb Action: w/ SEN COMM AMD
Sub Bill For:
Proposed Amd:
Date: May 2, 2001 6:02 PM Author: DEWITT
Dept/Agy: State Employees Group Benefits Program (SEGBP)
Subject: Reorganization of SEGBP Analyst: Brian Crow
 +$25,588,861 GF EX See Note
INSURANCE/GROUP — STATE: Provides for the reorganization of SEGBP group life and health group programs.
The proposed legislation provides for the reorganization of SEGBP pursuant to the recommendation of the Governor's State Employee Group Benefits Study Commission. The proposed legislation provides for the following: 1) changes the name of SEGBP to the Office of Group Benefits (OGB); 2) transfers the authority for management of the entire program to OGB and specifies that benefit plans and premium rates are to be developed under the direction of the commissioner of administration; 3) creates the Board of OGB Policy and Planning (16 members with 15 voting) to review life and health benefit programs offered through OGB and provide written recommendations to the appropriate legislative oversight committee; 4) specifies that the commissioner of administration shall select the CEO for the program and requires the CEO to appoint the chief operating officer (COO); 5) establishes uniform eligibility criteria for participation in life, health, and other benefit programs sponsored by OGB; 6) establishes uniform criteria for a state agency, school board, or political subdivision to withdraw from programs in OGB; 7) requires that any state agency, school board, or political subdivision that withdraws from OGB shall pay, in advance, a pro-rata portion of any accrued unfunded liability associated with the program; 8) increases the state's contribution of the total health care premium to 58% in FY 02, 65% in FY 03, and 75% in FY 04; 9) changes the state's contribution for active employees hired after January 1, 2002 for retirement benefits based on years of service to 19% for less than 10 years, 38% for 10 to 15 years, 56% for 15 to 20 years, and 75% for more than 20 years of active participation; 9) eliminates payment of health insurance premiums by SEGBP for any elected official whose is subject to term limits; and 10) includes a grandfather clause to provide for continued coverage for all existing participants in the program when the bill becomes effective. The bill becomes effective upon signature of the governor or lapse of time for gubernatorial action.
EXPENDITURES 2001-02 2002-03 2003-04 2004-05 2005-06 5 YEAR TOTAL
State General Fd. $25,588,861 $25,979,324 $37,442,625 $20,382,277 $22,929,802 $132,322,839
Agy. Self-Gen. $11,994,779 $12,177,806 $17,462,897 $9,554,169 $10,748,345 $62,026,331
Stat. Deds./Other $21,923,790 $22,258,327 $32,079,749 $17,462,897 $19,645,586 $113,370,349
Federal Funds $7,130,230 $7,239,030 $10,433,231 $5,679,423 $6,389,294 $6,389,294
Local Funds $0 $0 $0 $0 $0 $0
Annual Total $66,637,660 $67,654,489 $97,506,835 $53,078,716 $59,713,027 $344,590,727
REVENUES 2001-02 2002-03 2003-04 2004-05 2005-06 5 YEAR TOTAL
State General Fd. $0 $0 $0 $0 $0 $0
Agy. Self-Gen. SEE BELOW SEE BELOW SEE BELOW SEE BELOW SEE BELOW
Stat. Deds./Other $0 $0 $0 $0 $0 $0
Federal Funds $0 $0 $0 $0 $0 $0
Local Funds $0 $0 $0 $0 $0 $0
Annual Funds

EXPENDITURE EXPLANATION:
The expenditures shown above represent the increased cost that the statewill incur to provide for the proposed state contribution of health carepremiums paid to SEGBP, excluding $31,500 for travel expenses of the Board and $3,500 for printing costs to publish rules and regulations.
The proposed legislation will increase the state contribution asfollows: FY 02 from 50% to 58%; FY 03 from 58% to 65%; and 04 from 65% to 75%. The increases will enable SEGBP to eliminate cumulative prior year deficits in the program (estimated to be approximately $140 to $145 million by June 30, 2001) and to adequately fund the program for anticipated utilization and inflationary increases. The amounts shown above are based on estimates and assumptions provide by SEGBP as follows:
1) The state contribution for active employees increases from 50% in FY 01 to 75% in FY 04 and continues at that level;
2) The rate increase in FY 02 for PPO is 18.2%; for EPO is 26%; and for HMO is 12%;
3) The proposed benefit modification package will reduce claims payments by $43.7 million;
4) The program will increase premiums 12.5% per year to pay for medical and pharmacy inflation;
5) The state will contribute equally for all employees regardless of the option selected by the employee (PPO, EPO, or HMO); 
6) The total enrollment and demographics of active employees will remain stable.
NOTE: If assumption 3 ($43.7 million — rule changes related to benefit modification in the PPO and EPO) is not implemented, the rate increase for FY 02 will be adjusted upward by 6% to 7%.
In addition, the proposed legislation reduces the state contribution paid for health care premiums of retirees hired on or after January 1, 2001 as follows: 1) from 75% to 19% for less than 10 years of service; 2) from 75% to 38% for 10 to 15 years of service; 3) from 75% to 56% for 15 to 20 years of service; and 4) 75% for more than 20 years of service. The extent of the reduction for state contributions for retiree premiums is unknown, and will depend on the number of employees retiring in each bracket. Obviously, the more employees that meet the qualifications to retire with 20 years or less service and opt to retire, the greater the reduction. In FY 00, the state paid approximately $91.1 million (75% of $121.5 million) for retiree health care premiums.
Also, the proposed legislation establishes uniform criteria for a state agency, school board, or political subdivision to withdraw from programs in OGB. The impact on the expenditures of SEGBP (OGB) as a result of this measure is minimal. The bill does the following: 1) expands termination provisions of existing law to include local school boards, political subdivision, or other entity; 2) requires the head of any agency to provide written notice of intent to withdraw to OGB at least 30 days prior to the anniversary date of the agency joining the program; 3) requires the terminating entity to pay, in advance, an actuarially determined pro rata share of any accrued liabilities of the program; and 4) prohibits said termination until the entire amount of actuarially determined liability is paid in full.
Provisions 1 and 2 above should have very minimal impact on the expenditures of SEGBP (OGB). Provisions 3 and 4 will allow SEGBP to recover expenditures for payment of claims for the terminating entity in excess of paid premiums prior to termination (reimbursement for loss equivalent for that agency).
The bill specifies that the commissioner of administration shall select the CEO (confirmed by Senate) for the program and requires the CEO to appoint the chief operating officer (COO). This will not impact the expenditures of SEGBP (OGB) as these positions are funded in the current budget for the agency.
REVENUE EXPLANATION:
The revenues of SEGBP (or OGB) will increase by amounts similar to those shown above in expenditures.
Senate House
[X] 13.5.1 $500,000 6.8(F) $500,000 Annual Fiscal Cost
 13.5.2 $500,000 6.8(G) $500,000 Tax or Fee Increase or a Net Fee Decrease per year
DUAL REFERRAL RULES
Senate House
 13.5.1 $500,000 Annual 6.8(F) $500,000 Annual Fiscal Fiscal Cost Cost
 13.5.2 Annual Tax or 6.8(G) $500,000 Tax or Fee Fee Change Increase or a Net Fee Decrease per year
____________________ H. Gordon Monk STAFF DIRECTOR